**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Robert N. MESSERSMITH, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 19, 2003.

Filed Oct. 19, 2004.

Thomas B. Sponaugle, York, for appellant.

Timothy Barker, Assistant District Attorney, York, for Commonwealth, appellee.

Before: TODD, BENDER, and BECK, JJ.

TODD, J.:

¶ 1 Robert N. Messersmith appeals the judgment of sentence imposed on December 18, 2002 by the York County Court of Common Pleas, the Honorable John C. Uhler, presiding, after a jury convicted him of second-degree murder. This Court heard oral argument on this appeal on November 19, 2003. After careful review, we affirm.

¶ 2 In 1969, Lillie Belle Allen and her family, who were African–American and lived in South Carolina, were visiting Allen's sister, Hattie Dickson, in York, Pennsylvania. At that time, there were ongoing racial riots in the city of York. On July 21, 1969, after spending the day fishing, Dickson drove Allen and the other family members into York in order to go to the grocery store. As their vehicle stopped at a red light at the intersection of Philadelphia and Newberry Streets, the family noticed police officers on the sidewalks with sawhorse barricades. Dickson turned the car onto North Newberry Street, and upon reaching a set of railroad tracks, the family noticed a white male standing in the window of a nearby building with a gun pointed at them. Dickson attempted to turn the car around, but as she did so, the car was hit by a barrage of gunfire. After the shooting stopped, Allen told her sister that she was going to take the wheel. As Allen exited the car, the gunfire resumed and Allen was fatally shot.

¶ 3 On or about April 26, 2001, more than thirty years later, Appellant was charged with first-and second-degree murder and voluntary manslaughter for the death of Lillie Belle Allen. The evidence at trial established that at the time of Allen's murder, Appellant was 19 years old and a member of a local city gang known as the "Newberry Street Boys." On the day before Allen's murder, Appellant attended a "white power" rally near Kiwanis Lake. Several hundred people were present at the rally, including police officers. On the day Allen was killed, Appellant was confronted by two brothers, James and Sherman Spells, regarding his possible

role in a firebomb attack on their mother's home. During the confrontation, Appellant remained on his front porch at 229 North Newberry Street with a shotgun in his hands.

¶4 Subsequently, as Dickson's vehicle approached the railroad tracks from the Philadelphia Street area and turned onto North Newberry Street, Appellant appeared from between some parked cars and started running down the middle of the street. Armed with his shotgun, Appellant stopped a short distance away from Dickson's vehicle, shouldered his gun, and fired at the car. At least one eyewitness testified that this was the first shot fired at Dickson's vehicle. Appellant then briefly exchanged words with some other individuals on the corner, following which Dickson's vehicle was barraged by gunfire.

¶5 Appellant was tried before a jury along with eight other defendants, and on October 19, 2002, he was convicted of second-degree murder. On December 18, 2002, Appellant was sentenced to 108 to 228 months incarceration. This timely appeal followed, wherein Appellant raises the following issues for this Court's review:

I. Did the prosecutor commit reversible error when, in his closing argument, he made an explicit reference to the Bible by stating, "[T]he law has always been, thou shalt not kill"?

II. Was reversible error committed during the course of the trial due to the fact that jurors took notes during the course of the trial, took them into the jury room during deliberations, and used them during deliberations with the consent of the trial court, after which the Appellant was denied a hearing by the trial court to question the jurors regarding this conduct?

III. Did the trial court commit reversible error by improperly instructing the jury on the applicability of accomplice liability to the crime of Voluntary Manslaughter?

IV. Did the various excursions of jurors from the jury room during the course of deliberations so taint the proceedings that no fair determination of guilt or innocence could have occurred, thereby constituting reversible error?

V. Did the 32 year delay between the shooting of Lillie Belle Allen and the arrest of Appellant so prejudice the proceedings because of loss of physical evidence and the death and/or unavailability of numerous witnesses cause the Appellant actual prejudice impairing his ability to defend against the charges and the delay was a product of reckless conduct by the prosecution and a change of prosecutorial policy violate Appellant's right to due process?

VI. Did the trial court commit reversible error by failing to grant Appellant's Motion for Mistrial based upon the prosecutor's questioning of one of Appellant's forensic experts by implying that Appellant and Appellant's counsel were withholding incriminating physical evidence?

VII. Did the trial court commit reversible error by denying Appellant's Motion for Mistrial based upon Detective George's testimony that he instructed Appellant to speak with his attorney and then tell the police his side of the story and no testimony was ever presented that Appellant ever did so constitute an improper reference to Appellant's 5th, 6th and 14th Amendment Rights to counsel and to remain silent?

VIII. Did the trial court commit reversible error by denying Appellant's Motion to Suppress Physical Evidence Seized pursuant to a Search Warrant executed on July 24, 1969 when the Search Warrant was based upon an unknown confidential informant and a de-

ceased affiant based upon information that was uncorroborated?

IX. Did the trial court commit reversible error by denying Appellant's Motion to Suppress Statements made by the Appellant on the day of his arrest based upon questioning by Detective George of the Appellant when Detective George knew Appellant was represented by counsel?

X. Did the trial court commit reversible error by sentencing Appellant to a term of imprisonment well in excess of all other Co–Defendants when it improperly considered the conviction of Appellant for a crime that occurred after the shooting of Lillie Belle Allen and ignored substantial mitigating factors?

(Appellant's Brief at 4–6.) We will address Appellant's arguments *seriatim.*

¶ 6 Appellant's first argument concerns the following statement made by the district attorney in his closing argument on October 17, 2002:

> There is no it-was-a-riot defense. There was no it-was-a-crazy-time defense. Every life is sacred regardless of whether things changed between 1969 and today. The law has always been, thou shalt not kill, and in the Commonwealth of Pennsylvania before you use deadly force, you must retreat if you can do so safely.

(N.T. Trial, 10/16/02, at 4120–21.) Appellant argues that the statement "thou shalt not kill" was an impermissible reference to the Bible that constitutes reversible error. We disagree.

¶ 7 As this Court previously has explained:

> The decision whether to grant a new trial because of alleged prosecutorial misconduct rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Rios*, 554 Pa. 419,

429–30, 721 A.2d 1049, 1054 (1998). Comments by a prosecutor do not constitute reversible error unless the language was such that its unavoidable effect was to prejudice the jury, forming in their minds fixed bias or hostility towards the defendant, so that they could not weigh the evidence objectively and render a true verdict. *Id.*

*Commonwealth v. Spotz*, 562 Pa. 498, 541–42, 756 A.2d 1139, 1163 (2000).

¶ 8 Appellant argues that the district attorney's comments in the instant case constitute reversible error *per se* under our Supreme Court's holding in *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991). In *Chambers*, our Supreme Court held that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se." *Id.* at 586, 599 A.2d at 644. The Court further noted that by arguing to the jury that the Bible states "and the murderer shall be put to death," the prosecutor in that case suggested to the jury "that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [the appellant]." *Id.*

¶ 9 Appellant concedes, with respect to the instant case, that the district attorney did not refer specifically to the Bible; Appellant relies, however, on our Supreme Court's holding in *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998), wherein the Court, relying on its decision in *Chambers*, concluded that the prosecutor's reference to "a page in that book [which] says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law," during the penalty phase of the appellant's trial was reversible error. *Id.* at 493–95, 711 A.2d at 457 (citation omitted). The Court acknowledged that the prosecutor did not

say the word "Bible", but concluded that the language the prosecutor used was distinctive and "undeniably a direct reference to [specific] Bible passages and a violation of our stern warning to prosecutors in *Chambers*." *Id.* at 494, 711 A.2d at 457–58.

¶ 10 Subsequent to its decision in *Brown*, our Supreme Court again had occasion to address a claim that a prosecutor impermissibly quoted from the Bible during his closing argument in *Commonwealth v. Spotz, supra.* In *Spotz*, the prosecutor, in response to an earlier statement by defense counsel that the appellant had a troubled childhood, stated during his closing argument: "Did Mark Spotz have a troubled childhood? I don't know that—I don't know that the Commonwealth would dispute that fact. But long before Dustin Spotz was killed and June Ohlinger and Penny Gunnet were murdered, Mark Spotz became a man and put away childish things." *Spotz*, 562 Pa. at 543, 756 A.2d at 1164. The appellant argued on appeal that "the prosecutor's responsive argument was a direct reference to 1 Corinthians 13:11, where St. Paul writes, 'when I was a child, I talked like a child, I thought like a child, I reasoned like a child. When I became a man, I put childish ways behind me,'" which was impermissible and constituted reversible error *per se* under *Chambers*. *Spotz*, 562 Pa. at 543, 756 A.2d at 1164.

¶ 11 In rejecting Spotz's argument, our Supreme Court explained:

First, it is not clear that the prosecutor was invoking the Bible. He certainly never mentioned the Bible by name, nor did he otherwise suggest that he was invoking the Bible. This is in sharp contrast to *Chambers*, where the reference was explicit, *see* 528 Pa. at 585, 599 A.2d at 643 (prosecutor argued, "as the Bible says 'and the murderer shall be put to death'") or *Brown*, where the

reference was very thinly veiled, *see Brown*, 551 Pa. at 493, 711 A.2d at 457 (in case where defendant was convicted of killing a three-year-old child, prosecutor stated, "there is a page in that book, it says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law . . . .").

Here, the prosecutor's statement merely had five words in common with the passage from Corinthians. Furthermore, even if the phrase employed by the prosecutor could be said to have a biblical origin, we cannot say that this phrase was so distinctive that the jury must have believed that a religious document was being invoked. Much of our everyday speech and idiomatic expressions can be traced to biblical sources. To ban all such phrases based upon their etymology might ultimately operate to ban most speech, or certainly most speech concerning moral matters such as criminal responsibility.

More importantly, the impropriety that *Chambers* and *Brown* sought to eradicate was the invocation of biblical or religious authority *in support of* a death penalty verdict. As we explained in *Chambers* : "this argument [that the Bible supports the imposition of the death penalty] advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [a defendant] . . . . If a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law." *Chambers*, 528 Pa. at 586–87, 599 A.2d at 644; *cf. Carruthers v. State*, 272 Ga. 306, 528 S.E.2d 217 (2000). We reiterated this point more recently in *Brown* : "*reliance* upon the

Bible in any manner during a closing argument during the penalty phase is reversible error per se pursuant to *Chambers*." *Brown*, 551 Pa. at 493, 711 A.2d at 457 (emphasis added).

Here, the prosecutor made the alleged biblical reference as he was explaining to the jury that appellant was no longer a child and, therefore, his alleged troubled childhood could not excuse his conduct. The prosecutor did not remotely suggest that there was a biblical bias, independent of Pennsylvania law, for sentencing appellant to death. Accordingly, the prosecutor did not violate the holdings in *Chambers* and *Brown*.

*Spotz*, 562 Pa. at 544–45, 756 A.2d at 1164–65 (footnotes omitted).

■ ¶ 12 Likewise, we find that the comments made by the prosecutor in the instant case do not rise to the level of impropriety as did the prosecutor's comments in *Chambers* and *Brown*. Instantly, the district attorney did not mention the Bible by name, and though the statement "thou shalt not kill" has a biblical origin, the district attorney's comments, when viewed as a whole, did not suggest to the jury that there was a biblical basis, *independent of the law*, for convicting Appellant. Indeed, the district attorney stated "[t]he *law* has always been, thou shall not kill, and *in the Commonwealth of Pennsylvania* before you use deadly force, you must retreat if you can do so safely." (N.T. Trial, 10/16/02, at 4120–21 (emphasis added).)

¶ 13 Furthermore, as noted above, our Supreme Court in *Spotz* explained that "the impropriety that *Chambers* and *Brown* sought to eradicate was the invocation of biblical or religious authority *in support of* a death penalty verdict." *Spotz*, 562 Pa. at 544, 756 A.2d at 1164 (emphasis original). The district attorney's comments in the instant case were

not made during the penalty phase of Appellant's trial. Thus, we reject Appellant's contention that the district attorney's comments constituted reversible error.

¶ 14 Appellant next argues that a new trial is required because one of the jurors took notes during the course of the trial and took those notes into the jury room during deliberations. Appellant further argues that the trial court erred in refusing to hold an evidentiary hearing on the matter. We disagree in both respects.

¶ 15 Rule 644 of the Pennsylvania Rules of Criminal Procedure provides that "[t]he jurors shall not be permitted to take notes during the course of the trial." Pa. R.Crim.P. 644. As our Supreme Court explained in *Commonwealth v. Pierce*, 453 Pa. 319, 309 A.2d 371 (1973), "it is improper for a juror to take notes and use such notes in the jury room, and if the defendant can establish prejudice from such conduct he is entitled to a new trial." *Id.* at 322, 309 A.2d at 372. It first must be noted that in the instant case, the juror who took notes did so after he went home each night, and not during the testimony or actual court proceedings. Thus, the issue is not whether the note-taking juror was distracted from the testimony itself, which is one of the rationales for the prohibition against note-taking. *See Thornton v. Weaber*, 380 Pa. 590, 112 A.2d 344 (1955). Rather, the critical issue is whether Appellant was prejudiced by the fact that the notes were taken into the jury room.

¶ 16 As the Court noted in *Pierce*, however:

[We] cannot accept the statement of jurors as to what transpired in the jury room as to the propriety or impropriety of a juror's conduct. To do so, would destroy the security of all verdicts and go far toward weakening the efficacy of

trial by jury, so well grounded in our system of jurisprudence. Jurors cannot impeach their own verdict. Their deliberations are secret and their Inviolability must be closely guarded. Only in clear cases [of] improper conduct by jurors, evidenced by competent testimony, should a verdict, which is fully supported by the evidence, be set aside and a new trial granted.

453 Pa. at 322, 309 A.2d at 372 (quoting *Friedman v. Ralph Bros. Inc.*, 314 Pa. 247, 249, 171 A. 900, 901 (1934)) (internal quotation marks and citations omitted); *see also Carter v. U.S. Steel Corp.*, 529 Pa. 409, 415, 604 A.2d 1010, 1013 (1992) (plurality) ("a juror is incompetent to testify as to what occurred during deliberations"). This rule often is referred to as the "no impeachment rule." *Carter*, 529 Pa. at 415, 604 A.2d at 1013.

■ ¶ 17 As the trial court recognized, however, there exists a narrow exception to the no impeachment rule. The exception allows "post trial testimony of extraneous influences which might have affected (prejudiced) the jury during their deliberations." *Pittsburgh Nat'l Bank v. Mut. Life Ins. Co.*, 493 Pa. 96, 101, 425 A.2d 383, 386 (1981). Extraneous information has been defined as information that was not provided in open court or vocalized by the trial court via instructions. *Boring v. LaMarca*, 435 Pa.Super. 487, 493, 646 A.2d 1199, 1202 (1994) (citing *Carter, supra*). Under the exception to the no impeachment rule, a juror "may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations." *Carter*, 529 Pa. at 415, 604 A.2d at 1013 (citing *Pittsburgh Nat'l Bank, supra*). Under no circumstances may jurors testify about their subjective reasoning processes. *Id.*

■ ¶ 18 This Court has further explained:

[o]nce the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. *Carter*, 604 A.2d at 1016. In determining the reasonable likelihood of prejudice, the trial judge should consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.*, at 1016–1017. This Court has held that where the extraneous evidence is not new, but rather is evidence that was presented at trial, prejudice is not established. *See Orndoff v. Wilson*, 760 A.2d 1 (Pa.Super.2000).

*Pratt v. St. Christopher's Hosp.*, 824 A.2d 299, 303 (Pa.Super.2003), *appeal granted*, 578 Pa. 695, 851 A.2d 142 (2004). Because a trial judge may not consider evidence regarding the subjective impact of an extraneous influence on any juror, "it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence." *Carter*, 529 Pa. at 420, 604 A.2d at 1016.

■ ¶ 19 In the instant case, following the filing of a post-trial motion for an evidentiary hearing by Appellant and his co-defendant, Gregory Neff, the trial judge reviewed the juror's notes, which consisted of eleven pages, and concluded:

this Court agrees, that the notes taken by Juror No. 3 constitute what may be deemed extraneous influence from one view point. The eleven pages of notes were not verbatim recitations of witness testimony or this Court's instructions[.] Yet, it is apparent, the subjective contents of the notes were summaries by Juror No. 3 of what he recalled over the course of the trial. These notes contain, *inter alia,* identification of the attorneys and their clients, physical descriptions of witnesses, summaries of testimony, and cursory credibility assessments by Juror No. 3 of some of the witnesses. Objectively scrutinized, the notes do not contain matters which were beyond that which was presented during the trial. Thus, this Court's decision to deny the Defendants' Motion on this issue rests upon a finding that the Defendants have failed to meet their burden of establishing that the notes caused a reasonable likelihood of prejudice.

Because jurors are not competent to testify as to what transpired during deliberations, this Court may not go any further than the face of the notes to determine whether a reasonable likelihood of prejudice was created by the notes that would require this Court to order a new trial. Taking all information in the notes at face value this Court finds that the Defendants have failed to prove that a reasonable likelihood of prejudice was created by the notes. Because the notes were taken daily, this Court does find that they go to a central issue in the case. The notes do however contain a very limited amount of information not directly generated from the witness stand, particularly the few credibility assessments made by Juror No. 3. This information is of the type one would expect to be discussed during jury deliberations and is one of the main functions of a jury in evaluating a wit-

ness's testimony. A juror's individual assessment of the credibility of a witness is intended to be part of the deliberation process. The notes are neither inflammatory nor emotional in nature. The indicia that perhaps brief discussion had occurred with another Juror as to the wealth or success of one of Robertson's character witness is not a central issue to either defendant Neff or Messersmith. Further, the notes do not indicate that pre-deliberations discussions constituting deliberations about the case took place.

As such, though this Court finds the notes to be an extraneous influence on the jury, the Defendants have failed to establish that they were prejudiced by the notes themselves in light of their content. This Court consequently cannot grant the Defendants an evidentiary hearing to delve further into the sanctity of the jury deliberation room which would violate the "no impeachment" rule in hopes of finding a shred of prejudice not visible on the face of the notes offered to this Court. The Jurors were instructed that it was their duty to consult with one another and that each of the Jurors must decide the case for himself or herself after there has been impartial consideration with his or her Jurors. We must presume that the instructions of this Court were adhered to, particularly since the jury was not polled.

(Trial Court Opinion, 11/15/02, at 10–12.)

¶ 20 Following our own careful review of the notes, we agree with the trial court's analysis and conclusions regarding the content of the notes. Furthermore, to the extent Appellant suggests that the trial judge should have conducted an evidentiary hearing on the issue of how the notes influenced the jury, i.e., whether the notes were discussed during the jury's delibera-

tions and whether the notes had a measurable impact on the verdict (Appellant's Brief at 33–34), we note that this is precisely the type of questioning prohibited by the no impeachment rule, since such questions pertain to the jury's subjective reasoning processes. Accordingly, we hold that the trial court did not abuse its discretion by failing to conduct an evidentiary hearing on the issue of the notes taken by a member of the jury, and we further hold that Appellant is not entitled to a new trial on this basis.

■ ¶ 21 Appellant's third allegation of trial court error concerns the court's allegedly improper jury instruction on the applicability of accomplice liability to the crime of voluntary manslaughter. As previously noted, Appellant was charged with first-degree murder, second-degree murder, and voluntary manslaughter. Appellant contends that the trial court's instructions on voluntary manslaughter were both incomprehensible and incorrect to the extent that the court advised the jury that accomplice liability does not apply to a charge of voluntary manslaughter. In response to Appellant's claim, the trial court noted, in its opinion written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, as follows:

> The jurors were instructed to sequentially address first degree murder, second degree murder and voluntary manslaughter as to [defendant Messersmith]. If, after concluding the Commonwealth had established its proof beyond a reasonable doubt as to the initially referenced charge, the jurors were instructed that they need deliberate no further the underlying subordinate charge. As Defendant Messersmith was convicted of second degree murder, whether this Court gave an improper charge with respect to the lesser charge of voluntary man-

slaughter is irrelevant. Further, as counsel for the Defendant failed to object on the record to this Court's initial charge, or any charge subsequent to a question posed by the jurors on the issue of voluntary manslaughter, this Court deems the issue as having been waived.

(Trial Court Opinion, 2/10/03, at 11.) We agree with the trial court that Appellant has waived his challenge to the trial court's jury instructions.

¶ 22 Rule 647 of the Pennsylvania Rules of Criminal Procedure provides, in relevant part: "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(B). Although Appellant does not dispute that no objection to the jury charge was made in the trial court, Appellant nevertheless argues that he is entitled to review of this issue under the "basic and fundamental error" rule, which our Supreme Court had held "to apply only in those limited situations where the alleged error in the charge 'affects the merits or justice of the case or ... offends against the fundamentals of a fair and impartial trial.'" *Commonwealth v. Lassiter*, 457 Pa. 582, 589, 321 A.2d 902, 905 (1974) (citing *Commonwealth v. Jennings*, 442 Pa. 18, 25, 274 A.2d 767, 770 (1971) (plurality)). However, in *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), our Supreme Court clarified that an allegation of basic and fundamental error will not "enable parties in criminal matters to seek reversal on alleged errors not properly raised below." *Id.* at 423, 326 A.2d at 274. Accordingly, we hold that Appellant has waived his claim regarding the trial court's erroneous jury instructions.

¶ 23 Appellant next argues that he is entitled to a new trial because several of

the jurors were observed on a balcony overlooking the front steps of the courthouse prior to the announcement of the verdict. Appellant relies on *Commonwealth v. Gockley*, wherein our Supreme Court stated:

> It is a well-established *general rule* that once a jury has been sworn in a capital case, its members may not separate until they have been discharged .... But we are living in a modern and practical age and there are exceptions to nearly every general rule. This Court has repeatedly held that the separation of the jury *even in a capital case* will not justify the grant of a new trial if it *clearly appears* that a juror was not improperly influenced and that the defendant was not prejudiced by what transpired.

411 Pa. 437, 457–58, 192 A.2d 693, 703 (1963) (citations omitted) (emphasis original).

¶ 24 In *Gockley*, following a Saturday session of trial, the trial court called a recess until Monday. Upon learning that certain members of the jury wished to attend church on Sunday, the trial judge granted them permission to do so. The jurors were to be accompanied by a bailiff, and were to be seated in a separate section of the church, and the appellant apparently agreed to the arrangement. Ultimately, there was no evidence that any jury member had availed himself of the opportunity to attend mass. However, one of the jurors went unaccompanied to the hotel barber shop for a haircut without permission of the court.

¶ 25 Based on the foregoing, the appellant argued that he was entitled to a new trial. The trial court refused the appellant's request, and stated

> We are completely satisfied that if in fact the two incidents complained of amounted to a separation of the jury the

record indicates conclusively that no harm resulted to the defendant. His counsel do not attempt to set forth how their client was prejudiced in any way. Separation of the jury, even in a capital case, does not necessarily require the granting of a new trial if no harm or prejudice resulted to the defendant as a result of the separation.

*Id.* at 457, 192 A.2d at 703. Our Supreme Court affirmed, stating "the evidence as to the temporary separations of the jury in the instant case showed that there had been no prejudice to the appellant, and we are convinced that the trial Judge did not abuse his discretion." *Id.* at 459, 192 A.2d at 704.

¶ 26 With regard to the case *sub judice*, we first note that, to the extent Appellant suggests in his statement of questions presented on appeal that the jurors left the jury room *during the course of deliberations*, this statement is inaccurate. Indeed, the jury had already reached its verdict at the time several jurors were observed on the courthouse balcony; the verdict had not, however, been announced in court.

¶ 27 Furthermore, the Court in *Gockley* explained that "a new trial will not be granted unless the alleged misconduct was prejudicial to the accused" and that "[s]uch matters rest largely in the discretion of the trial judge." *Id.* at 458, 192 A.2d at 704 (citing, *inter alia, Commonwealth v. Kosh,* 305 Pa. 146, 158, 157 A. 479, 483 (1931) (emphasis omitted)). Although Appellant asserts that jury members were within eye and earshot of the steps below the balcony, where the media and other court personnel often were present, Appellant fails to offer any evidence that there were, in fact, news media or court personnel present at that time, and Appellant fails to allege how he might have been prejudiced even if there had been, since

the jury already had arrived at its verdict. Accordingly, we will not disturb the trial court's determination that Appellant was not prejudiced by the separation of the jury prior to the announcement of its verdict.

¶ 28 Appellant next argues that his conviction must be reversed due to the 32-year delay between Lillie Belle Allen's murder and the time Appellant was brought to trial. Appellant asserts that due to the length of the delay, a fair determination of guilt or innocence could not have occurred. Preliminarily, we note that in *Commonwealth v. Snyder,* our Supreme Court explained that, with respect to allegations of due process violations based on pre-arrest delay, the analysis is the same under both the federal and Pennsylvania state constitutions. 552 Pa. 44, 56, 713 A.2d 596, 602 (1998).

¶ 29 The United States Supreme Court addressed the issue of pre-arrest delay, namely, delay between the occurrence of a crime and the indictment or arrest of a defendant for that crime, in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In *Marion,* the appellees were accused of engaging in a fraudulent business scheme from March 1965 through January 1966; they were not indicted on the charges until March 1970. The appellees moved to dismiss the indictment on the basis that their Sixth Amendment right to a speedy trial had been violated. The District Court for the District of Columbia granted the appellees' motion, and the United States appealed. The Supreme Court reversed, and in rejecting the appellees' speedy trial claim, opined:

The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial....' On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The amendment would appear to guarantee to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him. "(T)he essential ingredient is orderly expedition and not mere speed.'

404 U.S. at 313, 92 S.Ct. 455 (citation omitted).

¶ 30 After noting that the purpose of the Sixth Amendment's speedy trial provision is to prevent undue oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation, and to limit the possibility that long delay will impair the ability of an accused to defend himself, the Court further explained:

Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These considerations were sub-

stantial underpinnings for the decision in *Klopfer v. North Carolina,* [386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)]; *see also Smith v. Hooey,* [393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969)]. So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge. But we decline to extend that reach of the amendment to the period prior to arrest. Until this event occurs, a citizen suffers no restraints on his liberty and is not the subject of public accusation; his situation does not compare with that of a defendant who has been arrested and held to answer. Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.

*Id.* at 320–22, 92 S.Ct. 455 (footnotes omitted). The Court continued:

The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge.... These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.... Thus, there is no need to press the Sixth Amendment into service to guard against the mere possibility that pre-accusation delays will prejudice the de-

fense in a criminal case since statutes of limitation already perform that function. *Id.* at 322–23, 92 S.Ct. 455. Thus, under *Marion,* the Sixth Amendment does not entitle Appellant herein to relief.

¶ 31 Nevertheless, the Court in *Marion* noted:

[T]he statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that *the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.*

*Id.* at 324, 92 S.Ct. 455 (emphasis added). Ultimately, the Court in *Marion* held that the appellees had not

adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay; that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature. *Id.* at 325–26, 92 S.Ct. 455. Thus, it is clear under *Marion* that a defendant must

demonstrate actual prejudice in order to be entitled to relief based on a due process violation. *See United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (*Marion* establishes that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication"); *Snyder,* 552 Pa. at 54, 713 A.2d at 601 (*Marion* and *Lovasco* stand for the proposition that to establish a due process violation for a delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution); *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987) (when a defendant argues undue delay in the filing of charges, proof of prejudice is a prerequisite to consideration of whether there has been a denial of due process); *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258 (1990) (appellant failed to establish due process violation for 22–year delay in prosecution since he failed to show that the delay caused substantial prejudice).

¶ 32 In *Commonwealth v. Scher,* 569 Pa. 284, 803 A.2d 1204 (2002) (plurality), our Supreme Court explained:

> In order for a defendant to show actual prejudice, he or she must show that he or she was meaningfully impaired in his or her ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected. This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of an essential witness. It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time.

*Id.* at 314, 803 A.2d at 1222 (citations omitted).

¶ 33 We note that in his brief to this Court, Appellant fails to establish that he suffered actual prejudice as a result of the delay between the commission of the crime and the time he was brought to trial. Appellant contends that numerous witnesses have changed their testimony and/or cannot remember the events that took place. Appellant, however, fails to explain how he was prejudiced by the alleged changed testimony. Appellant further argues that many witnesses who could have provided exculpatory evidence now are deceased; however, Appellant fails to identify such witnesses, or even explain the nature of such exculpatory evidence.

¶ 34 Finally, although Appellant contends he was prejudiced by lost and/or destroyed evidence, the only specific example offered by Appellant is his argument that defense expert witnesses were unable to render opinions about the gun used to kill Allen due to the loss of the bullet fragment. Initially, we note that although Appellant's experts did testify that the loss of the bullet fragment was problematic, defense expert Dr. Cyril Wecht opined that the weapon used to kill Allen "more likely than not was a shotgun." (N.T. Trial, 10/11/02, at 3690.) Furthermore, Appellant fails to specifically explain how more definitive expert conclusions as to the exact type of gun used to kill Allen would have been favorable to his defense such that the verdict would have been different. Finding that Appellant has failed to establish that he was prejudiced by the delay in prosecution, we need not reach the issue of the propriety of the delay, and hold that Appellant is not entitled to relief on the basis that the delay violated his due process rights.

¶ 35 Next, Appellant contends that the trial court erred in refusing to grant a mistrial after the prosecutor, during his examination of one of Appellant's

forensic experts, allegedly implied that Appellant was withholding incriminating physical evidence. Initially, we note that the remedy of a mistrial is within the sound discretion of the trial court, and a court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. *Commonwealth v. Jones,* 542 Pa. 464, 488–489, 668 A.2d 491, 502–03 (1995). We find no abuse of discretion by the trial court in refusing to grant a mistrial in the instant case.

¶ 36 During his examination of defense expert Dr. Wecht, and in the course of asking whether an examination of the guns seized from the area of the crime scene would have been helpful in determining the source of the shotgun slug found in Allen's body, the prosecutor asked Dr. Wecht: "Did you ask defense counsel if he would provide you any of the guns that were seized?" (N.T. Trial, 10/11/02, at 3700), referring to weapons seized from Appellant's home pursuant to a search warrant in 1969. Appellant's counsel immediately objected, and the trial court sustained the objection and issued the following curative instruction:

> Ladies and gentlemen of the jury, an issue has arisen which prompts the Court to make immediate instruction regarding the ramifications of the issue. Number one, we strike the question posed by Attorney Kelley relative to whether or not the defense has produced for the benefit of Dr. Wecht any weapons to test.
>
> \* \* \* \* \* \*
>
> Number two, no weapons are presently in the custody of the Commonwealth, and the investigation has not discerned any weapons in the possession of the defense.
>
> \* \* \* \* \* \*

So the upshot of all of the above is the question is stricken, the answer is stricken, and it is not an issue that you may consider whatsoever in your deliberation process.

I remind you again, it is never the obligation of a Defendant to prove anything. It is always upon the part of the Commonwealth the duty and responsibility to prove guilt beyond a reasonable doubt as to each and every Defendant who stands before them.

(N.T. Trial, 10/11/02, at 3704–06.)

 ¶ 37 Appellant argues that the prosecutor's question "implies that Appellant and/or Appellant's counsel was hiding and/or destroying physical evidence in an effort to cover up the alleged crime committed by the Appellant." (Appellant's Brief at 48.) We disagree. Moreover, even were we to conclude that the prosecutor's remark was improper, our Supreme Court has held that prejudice caused by a prosecutor's improper comments can be cured by a trial court's instructions, and that the law presumes that juries follow the court's instructions. *Commonwealth v. Hall,* 549 Pa. 269, 287, 701 A.2d 190, 199 (1997); *Commonwealth v. Wesley,* 562 Pa. 7, 18, 753 A.2d 204, 210 (2000). As noted above, the trial court gave an immediate instruction to the jurors reminding them that it is never a defendant's burden to prove anything, advising them that there was no evidence that there were any weapons in the possession of the Commonwealth or the defense, and instructing them to disregard completely the prosecutor's question and Dr. Wecht's answer. Thus, we hold that any possible prejudice resulting from the prosecutor's comment was cured by the trial court's instructions.

¶ 38 Appellant also argues that the trial court erred in refusing to grant a mistrial based on the testimony of a Commonwealth witness, Detective Rodney George,

which Appellant alleges constituted an impermissible reference to the fact that Appellant exercised his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution to counsel and to remain silent. At trial, the district attorney asked Detective George about the events that transpired after Appellant was arrested for the shooting of Allen, and Detective George at one point stated:

I then told [Appellant] that I knew that he had an attorney representing him from previous contacts with him, and we told him to talk to his attorney, that we would like to sit down and talk to him and hear his side of the story, that we were very much interested in what he had to say.

(N.T. Trial, 10/9/02, at 3258–69.) Appellant argues that because there was no testimony presented later in the trial that Appellant did, in fact, speak with the police, and because Appellant did not testify at trial, Detective George's statement created an inference of guilt and suggested that Appellant "was hiding information or at the least had a criminal state of mind." (Appellant's Brief at 50.) We disagree.

¶ 39 Our Supreme Court has explained: It is axiomatic that a defendant enjoys a Constitutional right to remain silent and that it is a violation of that right where reference is made to the accused's post-arrest silence. A violation of that right will, however, be harmless error where it is clear that the error could not have contributed to the verdict.

*Commonwealth v. Nolen,* 535 Pa. 77, 86, 634 A.2d 192, 197 (1993) (citations omitted). In *Nolen,* the district attorney was cross-examining the defendant and stated "[p]rior to your testimony here in this courtroom today . . . you have not testified yourself, have you?" *Nolen,* 535 Pa. at 86, 634 A.2d at 197. Our Supreme Court noted that "this line of questioning did not

imply that appellant had exercised his right to remain silent when faced with questions from authorities. Nor did the Commonwealth here imply silence on the part of appellant after being informed of his constitutional rights." *Id.* at 88, 634 A.2d at 198. Thus, the Supreme Court held that this indirect reference to the defendant's silence was harmless error.

¶ 40 Similarly, in the instant case, we conclude that the statement by Detective George was not an improper reference to Appellant's exercise of his right to remain silent. Detective George merely recounted his indication to Appellant that the police would like to hear Appellant's side of the story. There was no testimony that Appellant refused to speak with police at that time, or at any time subsequent to his arrest. Moreover, to the extent that Appellant suggests that his failure to take the stand renders Detective George's testimony an improper comment on Appellant's invocation of his Fifth Amendment rights, we note that at the conclusion of Detective George's testimony, the trial court gave a number of supplemental instructions to the jury, including the following:

Secondarily, individuals being apprised of constitutional rights, they have a right to be apprised of their constitutional rights, and we all are aware of what those rights are and those include the right to counsel, the right to confer with counsel, the right to remain silent. Again I indicated at the outset that you cannot hold an individual responsible for not even testifying during the course of a trial. These rights are [inviolate] and you cannot infer anything from these. And the bottom line is that's not evidence that you can use against anyone.

(N.T. Trial, 10/9/02, at 3316.) Accordingly, for the reasons stated above, we hold that Appellant is not entitled to relief on this claim.

¶ 41 Appellant next argues that the trial court erred in denying his motion to suppress physical evidence seized pursuant to a search warrant that was executed on July 24, 1969. It is well settled that the admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. *Commonwealth v. LaCava,* 542 Pa. 160, 174, 666 A.2d 221, 227 (1995). This Court has explained:

> Our standard of review when addressing a challenge to a trial court's denial of suppression is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. *Commonwealth v. Hawkins,* 549 Pa. 352, 377, 701 A.2d 492, 504–05 (1997). When reviewing the rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Id.* Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.*

*Commonwealth v. Mickley,* 846 A.2d 686, 689 (Pa.Super.2004).

¶ 42 The search warrant at issue, which was prepared by Lieutenant R.A. Wasser, who is deceased, was based on statements provided by an unidentified confidential informant who reported that he personally had observed Appellant's father, John Messersmith, fire certain weapons at passing cars on North Newberry Street in York between July 18 and July 22, 1969. The affidavit in support of the search warrant provided:

> I was told on or about July 24, 1969, at about 3:00(?) PM in the neighborhood where said premises are located by an undisclosed informant, a person who I believe to be reliable because I have known that person personally for approximately twenty years and of my own personal [knowledge] based upon the reputation for truthfulness of that person in the community where the informant lives, I know the informant to be truthful, honest, and reliable;
>
> Said informant personally witnessed the said John N. Messersmith in possession of certain weapons as aforesaid using the same to shoot at passing cars on North Newberry Street, within the dates aforesaid, on various occasions.
>
> The following facts exist and are known to me and give me probable cause to believe that a search warrant as applied for should be issued, viz: that one Lillie Belle Allen, 27 years of age, on July 21, 1969 at 9:05 PM was shot within one and one-half blocks from said premises, a result of which she died.

(Trial Court Opinion, 3/28/02, at 62–63 (quoting Affidavit of Probable Cause).)

¶ 43 Appellant contends that "there is still absolutely no information to corroborate the unknown confidential informant's report of John Messersmith shooting," and that that such statement "is a deliberate and knowing misstatement of a material fact upon without which probable cause to search John Messersmith and Appellant's home would not exist." (Appellant's Brief at 51, 54.) Thus, Appellant argues that the search warrant was invalid, and that the results of the search should have been suppressed. We do not agree.

¶ 44 Appellant is correct in that "if a search warrant is based upon an affidavit containing deliberate or material misstatements, the search warrant is invalid." *Commonwealth v. Brown,* 836 A.2d 989, 992–93 (Pa.Super.2003) (citation omitted), *appeal granted,* 856 A.2d 831 (Pa. 2004). As noted above, Appellant argues

that there is no evidence to support the informant's statement that he saw weapons being fired by John Messersmith during a certain time period. However, as our Supreme Court noted in *Commonwealth v. Miller*, 513 Pa. 118, 518 A.2d 1187 (1986):

> it must be emphasized that it is the police official, who requested the warrant, whose veracity is the subject of the inquiry. The justification for employing the exclusionary device in the first instance is to deter perjurious police statements. The reliability of the informant's information must be determined from the facts supplied by the police official. Once the affidavit is sufficient on its face the question of the veracity of the statements contained therein is directed to the truthfulness of the officer.

*Id.* at 134, 518 A.2d at 1195. Thus, Appellant's challenge to the truthfulness of the *informant's* statement is misplaced, and is insufficient to overcome the presumption of the search warrant's validity.

¶ 45 Moreover, we agree with the trial court's conclusion that, based upon consideration of the information contained within the four corners of the affidavit in support of probable cause, "the issuing magistrate had a substantial basis for concluding that weapons and ammunition were likely to be found in the residence owned and occupied by John N. Messersmith when the warrant was executed on July 24, 1969," and that Appellant "has not demonstrated a good-faith basis for his allegation that the *Affiant* deliberately included a misstatement of material fact in the affidavit of probable cause." (Trial Court Opinion, 6/19/02, at 14 (emphasis added).) Thus, we find *no* error in the trial court's refusal to suppress evidence seized from John Messersmith's residence on July 24, 1969.

¶ 46 Appellant next contends that the trial court erred in refusing to suppress statements he made in response to questions posed by Detective George on the day of his arrest, when Detective George supposedly knew that Appellant was represented by counsel. We note, however, that Appellant does not identify in his brief any specific questions posed by Detective George, nor the specific statements which he contends should have been suppressed. Accordingly, as Appellant has failed to adequately present this issue, we deem it waived and decline to consider it further.

¶ 47 Finally, Appellant contends that the trial court abused its discretion in sentencing him to a term of imprisonment greater than that received by Appellant's codefendants. Appellant also argues that the trial court improperly considered Appellant's conviction for a crime which occurred after the shooting of Allen, and that the trial court ignored substantial mitigating factors in fashioning Appellant's sentence. We note that Appellant's issues pertain to the discretionary aspects of his sentence. Where an appellant challenges the discretionary aspects of a sentence, as in the instant case, there is no automatic right to appeal and an appellant's appeal should be considered a petition for allowance of appeal. *Commonwealth v. Ritchey*, 779 A.2d 1183, 1185 (Pa.Super.2001).

¶ 48 Pursuant to Rule 2119(f) of the Pennsylvania Rules of Appellate Procedure, before a challenge to a judgment of sentence will be heard on the merits, an appellant first must set forth in his or her brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of his or her sentence. *Id.* We note that Appellant has failed to include such a statement in his brief. Moreover, the Commonwealth has objected to this omission. Therefore, we are precluded from review-

ing the merits of Appellant's claims. *See Commonwealth v. Tuladziecki,* 513 Pa. 508, 522 A.2d 17 (1987); *Commonwealth v. Huckleberry,* 429 Pa.Super. 146, 151, 631 A.2d 1329, 1331 (1993) (because the Commonwealth specifically objected to appellant's failure to include a *Tuladziecki* statement in Appellant's brief, this Court was precluded from addressing the merits of appellant's challenges to the discretionary aspects of sentence).

¶ 49 Appellant has waived his sentencing issues for an additional reason. Issues challenging the discretionary aspects of sentencing must be raised in a post-sentence motion or during the sentencing proceedings. *Commonwealth v. Losch,* 369 Pa.Super. 192, 199 n. 6, 535 A.2d 115, 118 n. 6 (1987). Absent such efforts, an objection to a discretionary aspect of a sentence is waived. *Id.* Following our review of the record, it appears that Appellant did not raise his sentencing issues at sentencing or in post-sentence motions. Accordingly, he has waived the issues on this basis as well.

¶ 50 For all of the foregoing reasons, we affirm Appellant's judgment of sentence.

¶ 51 Judgment of sentence AFFIRMED.

¶ 52 BECK, J. files a Concurring Statement.

**BECK, J., Concurring:**

¶ 1 I join the majority opinion in all respects, but write separately for the purpose of urging the rescission of Pa. R.Crim.P. 644, which prohibits jurors from taking notes during the course of a trial.

¶ 2 A plea for Pennsylvania to join the ranks of virtually every other state in the union, as well as the entirety of the federal courts, in permitting note-taking by jurors is not new. Indeed, at this point, practitioners, judges, legislators, state and local bar associations, various court reform organizations and commissions, and even the state Criminal Rules Procedural Committee, have come out in favor of allowing jurors to take notes.[1]

¶ 3 The prohibition against note-taking arose because of perceived inequities between literate and illiterate jurors in the nineteenth century. While that concern has "largely dissolved," *see* Penrod & Heuer, *Tweaking Common Sense: Assessing Aids to Jury Decision Making,* 3 Psychol. Pub. Pol'y & L. 259, 263 (1997), and the "clear weight of authority" now permits jury note-taking, *see* Pertnoy, *The Juror's Need to Know vs. the Constitutional Right to a Fair Trial,* 97 Dick. L.Rev. 627, 633 (1993), Pennsylvania remains one of the few states that does not permit juror note-taking in some form. Instead, it appears that this Commonwealth is the only state that expressly prohibits jurors from taking notes.[2]

1. Currently, there exists in Pennsylvania a pilot program allowing note-taking in civil trials that last for more than two days. Set out at Pa.R.Civ.P. 223.2, it is a temporary provision "promulgated for the purpose of assessing whether juror note-taking in civil cases is beneficial to the system of justice in Pennsylvania." Pa.R.Civ.P. 223.2, Explanatory Comment. The Rule will be automatically rescinded on December 31, 2005. Pa. R.Civ.P. 223.2(e). This concurring statement addresses the Rules of Criminal Procedure, specifically Rule 644.

2. South Dakota, sometimes thought of as the only other state that prohibits note-taking by jurors in criminal trials, has a statutory provision setting out those items that jurors in criminal trials are permitted to bring into their deliberations. The law provides that only exhibits entered into evidence at trial may accompany jurors into the deliberation room. *See* S.D. Codified Laws § 23A–25–7. This criminal law provision is unlike its civil counterpart, which explicitly states that jurors "may also take with them [into deliberations] notes of the testimony or other proceedings

¶ 4 Note-taking by jurors has been recognized as valuable for decades. Jurors, sitting as the finders of facts, are asked to listen to multiple witnesses testifying over a period of days, and sometimes weeks, on often complex and detailed information. The charges, too, are often multiple, each requiring different elements and states of mind. To expect jurors to determine whether the Commonwealth has met its burden without the assistance of notes is unrealistic. Certainly, throughout a trial, defense counsel makes notes, the prosecutor makes notes and the trial judge makes notes. The prohibition against allowing the *decision-makers* in a case to take notes simply defies logic. The jurors, the only courtroom participants other than the defendant who are not learned in the law, should be permitted to commit to paper the evidence they deem worthy of recording.

¶ 5 Yet, juror note-taking remains forbidden in Pennsylvania despite countless studies showing the benefits jurors gain from note-taking, including refreshing their memories and focusing their concentration, *United States v. Maclean,* 578 F.2d 64, 66 (3d Cir.1978), allowing them to absorb and synthesize information more readily, *People v. Hues,* 92 N.Y.2d 413, 681 N.Y.S.2d 779, 704 N.E.2d 546, 549 (1998), and aiding their comprehension. Pennsylvania Criminal Procedural Rules Committee Proposed Rule 644, 33 Pa. Bulletin 2164. Even more significant is the fact that these same studies have debunked most of the proffered reasons against note-taking, *i.e.,* that jurors may overemphasize the evidence they have noted, that jurors cannot keep pace with the trial while taking notes, that note-taking jurors distract other jurors and have an undue influence over non-note-takers, and that note-taking favors either the prosecution or the defense. *See* Penrod & Heuer, *supra,* at 271. *See also* the National Center for State Courts website at *http://www.ncsconline.org/WC/FAQs/JurInnFAQ.htm.*

¶ 6 In light of all the data on this issue, it is only logical to conclude that the act of taking notes helps to keep jurors focused and minimizes the danger that their minds will wander from the drama unfolding before them. Later, during deliberations, the notes may serve to foster meaningful and comprehensive discussion of the issues raised at trial.

¶ 7 In my view, credible and reliable support for juror note-taking has been in place for well over forty years, even before the Federal Judicial Conference Committee recommended that it be permitted. *See* The Jury System in the Federal Courts: Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 411 (1960) (suggesting that jurors be allowed to take notes at the discretion of the trial judge). The extensive state and federal jurisprudence that has developed since that time has served only to bolster that support. *See generally, Taking and Use of Trial Notes by Jury,* 36 A.L.R. 5th 255.

¶ 8 In 2003, the Pennsylvania Criminal Procedural Rules Committee set forth an extensive proposal to lift the ban on jury note-taking and put in its place a precise framework setting out the manner in which note-taking may be accomplished, the use for which notes may be had, the confidential nature of such notes and the destruction of same. In addition, the Committee set out a detailed and thorough instruction, to be given by the trial judge to the jury, explaining the complete note-taking procedure. This action by the Committee followed repeated suggestions from the Pennsylvania bench and bar call-

on the trial taken by themselves." S.D. Codi- fied Laws § 15–14–20.

ing for removal of Rule 644, as well as four successive legislative sessions that saw the introduction, though not passage, of a bill to allow jury note-taking. Still, Rule 644 remains in effect.

¶ 9 Clearly, the wisdom and practicality of permitting jurors to take notes is best exemplified in a case such as the one before us, which involved multiple defendants, numerous attorneys, and dozens upon dozens of witnesses who testified about events that occurred several decades ago. However, the value of jury note-taking exists in every case and, in light of the fact that its benefits outweigh its dangers—real or perceived—I believe it should be allowed. I am convinced that juror note-taking enhances the reliability of verdicts.

¶ 10 The time has come for Pennsylvania to rescind its rule prohibiting jurors from taking notes and to adopt a rule permitting them to do so. The Honorable Richard C. Wesley of the New York Court of Appeals, in explaining why he was certain that note-taking by jurors should be permitted, eloquently stated that to do so would "respond to contemporary challenges facing our jury system, the overwhelming authority of Federal and other State courts, and a healthy dose of common sense." *People v. Hues, supra,* at 779, 704 N.E.2d at 547. I wholly concur.

