J-S89027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MATTHEW HENDRICKS | |
| Appellant | No. 234 EDA 2016 |

Appeal from the PCRA Order December 23, 2015
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0003173-2009

BEFORE: SHOGAN, J., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.:                              **FILED JULY 11, 2017**

Matthew Hendricks appeals from the December 23, 2015 order entered in the Lehigh County Court of Common Pleas dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. We affirm.

The factual history of this matter was comprehensively recounted in the trial court's opinion denying Hendricks' post-verdict motions, which we adopt and incorporate herein. *See* Trial Ct. Op., 10/6/11, at 2-12. This appeal arises from the shooting death of David Rivera in April 2007. Hendricks and an alleged co-conspirator, Clyde Lont, were charged in connection with Rivera's death. On May 3, 2011, following Hendricks' jury-

_____

[*] Former Justice specially assigned to the Superior Court.

trial conviction[1] for third-degree murder,[2] the trial court sentenced him to 20 to 40 years' incarceration. Hendricks filed timely post-sentence motions, arguing that he was entitled to a new trial because of after-discovered evidence,[3] trial court error, and juror misconduct. The trial court denied the motions on October 6, 2011. On January 7, 2013, this Court affirmed his judgment of sentence. Hendricks filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on July 3, 2013.

On June 19, 2014, Hendricks filed a counseled PCRA petition, alleging a **Brady**[4] violation. On October 29, 2014 and December 18, 2014, the PCRA court held a hearing on Hendricks' petition. On January 21, 2015, Hendricks filed an amended PCRA petition, alleging that trial counsel was ineffective for not raising the issue of inconsistent verdicts in a post-sentence motion or on direct appeal.[5] Also on January 21, 2015, Hendricks' counsel filed a motion

_____

[1] Hendricks was acquitted of criminal conspiracy to commit homicide, 18 Pa.C.S. § 903(a)(1).

[2] 18 Pa.C.S. § 2502(c).

[3] In his motions, Hendricks said that his counsel had received, after Hendricks' trial, a notarized statement from Clyde Lont stating that Lont had acted "without the assistance, planning or knowledge of" Hendricks. Post-Trial Mot., 5/10/11, at 2.

[4] **Brady v. Maryland**, 373 U.S. 83 (1963).

[5] In Hendricks' amended petition, PCRA counsel, who at the time had represented Hendricks at all stages of this matter, including trial, raised the issue of his own ineffectiveness and requested the appointment of new counsel.

to withdraw. That same day, the PCRA court granted the motion and appointed new PCRA counsel.

On June 24, 2015, the PCRA court held a hearing on Hendricks' additional PCRA claim. On December 23, 2015, the PCRA court dismissed Hendricks' petition. On January 12, 2016, Hendricks filed a timely notice of appeal.

Hendricks raises the following issues on appeal:

1. Whether the PCRA court erred when it found there was no violation of [**Brady v. Maryland**]?

2. Whether the PCRA court erred when it denied relief on the basis of the inconsistent verdicts?

Hendricks' Br. at 6.

Our standard of review of the denial of PCRA relief "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa.Super. 2011). We will not disturb the PCRA court's factual findings "unless there is no support for [those] findings in the certified record." **Commonwealth v. Melendez-Negron**, 123 A.3d 1087, 1090 (Pa.Super. 2015).

We first address Hendricks' allegation that the PCRA court erred in finding the Commonwealth did not commit a **Brady** violation. "[T]here are three necessary components that demonstrate a violation of the **Brady** strictures: the evidence was favorable to the accused, either because it is

- 3 -

exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." *Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005) (quoting *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001)). Hendricks contends that the Commonwealth withheld information regarding statements made by Janelle Gordon, who testified for the prosecution at trial. In particular, Hendricks avers that Gordon had informed the prosecution that Lont, who pled guilty to third-degree murder and conspiracy to commit first-degree murder, told her that Hendricks had nothing to do with Rivera's murder.

Hendricks' claim is without merit. In support of his contention that the Commonwealth violated the dictates of *Brady*, Hendricks offered Gordon's testimony[6] at the PCRA hearing.[7] At the hearing, Gordon testified as follows:

> Q. During any of those occasions [that you met with the prosecution], did you share with prosecution officials what Mr. Lont had said to you about the extent to which Mr. Hendricks was in any way involved in this homicide?

---

[6] In his original PCRA petition, Hendricks averred that "[s]ubsequent to the conclusion of [Hendricks'] direct appeal, undersigned counsel was contacted by Janelle Gordon, an important Commonwealth witness at the trial." PCRA Pet., 6/19/14, at 2 (unpaginated).

[7] Joshua Fulmer, Esquire, one of Hendricks' trial attorneys, testified that the defense chose not to call Lont because his attorney had indicated that he would invoke his Fifth Amendment privilege against self-incrimination if called to testify. N.T. PCRA, 10/29/14, at 53.

- 4 -

A. Yes.

Q. Okay. And what specifically did you tell the police or the District Attorney about that?

A. He had nothing to do with it. That he was just there and he was scared. That actually Mr. Hendricks was going to go to the police and provide them, you know, with information about the murderer and eventually wanted to kill him himself. []

N.T., 10/29/14, at 11. Gordon explained that Lont told her he wanted to kill Hendricks. *Id.* at 12. She testified that the prosecution told her not to speak to "anyone about anything" and instructed her not to "bring up anything" that Lont had told her about Hendricks at trial. *Id.* at 15. Gordon said that she brought up what Lont had allegedly told her every time she spoke with police. *Id.* at 16-17.

Bethany Zampogna, Esquire and Jay Jenkins, Esquire, chief deputy district attorneys ("CDDAs") involved with the investigation of Rivera's death and Hendricks' ensuing trial, also testified at the hearing. Zampogna and Jenkins testified that Gordon never told them that Lont had told her that Hendricks was uninvolved with Rivera's shooting. N.T., 12/18/14, at 6, 17-18. Zampogna testified that as a result of a motion *in limine* to exclude Lont's statements to Gordon, she instructed Gordon not to say anything that Lont had told to her. *Id.* at 7. Zampogna also testified that she never told Gordon not to speak to the defense or anyone else. *Id.* at 7-8. William Dosedlo, a lieutenant with the Bethlehem Police Department who was involved with the case, also testified that Gordon had "never once in this

investigation" told him of Lont's statement that Hendricks had nothing to do with the shooting. *Id.* at 12-13.

The PCRA court credited the testimony of Dosedlo and the CDDAs and discredited Gordon's testimony. PCRA Ct. Op., 12/23/15, at 4. In particular, the PCRA court found that each statement given by Gordon had been disclosed to the defense, and that Gordon never told the prosecution about Lont's alleged statement. *Id.* Because the record supports the PCRA court's credibility determinations, we are bound by them. ***Commonwealth v. Dennis***, 17 A.3d 297, 305 (Pa. 2011). Therefore, we conclude the PCRA court did not err in denying Hendricks' PCRA claim based on the Commonwealth's alleged violation of ***Brady***.

We next turn to Hendricks' claim that the trial court erred in denying relief based on trial counsel's ineffectiveness. When analyzing ineffectiveness claims, "[w]e begin . . . with the presumption that counsel [was] effective." ***Commonwealth v. Spotz***, 18 A.3d 244, 259-60 (Pa. 2011). "[T]he [petitioner] bears the burden of proving [counsel's] ineffectiveness." ***Commonwealth v. Ligons***, 971 A.2d 1125, 1137 (Pa. 2009). To overcome the presumption of effectiveness, a PCRA petitioner must demonstrate that: "(1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance." ***Id.*** "A

claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." **Id.**

Hendricks argues that counsel was ineffective for failing to challenge the inconsistency of the verdicts in a post-sentence motion or on direct appeal. The trial court concluded that Hendricks' conviction for third-degree murder was not inconsistent with his acquittal on the conspiracy charge because the Commonwealth proceeded on both co-conspirator and accomplice liability theories. We agree.

Moreover, even if we were to conclude the verdicts were inconsistent, Hendricks would not be entitled to relief.

> It is well-settled that inconsistent verdicts are permissible in Pennsylvania. Inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment. When an acquittal on one count [] is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is sufficient evidence to support the verdict. Further, [a]n acquittal cannot be interpreted as a specific finding in relation to some of the evidence[.]

**Commonwealth v. Talbert**, 129 A.3d 536, 545 (Pa.Super. 2015) (internal citation and quotations omitted) (alterations in original), *app. denied,* 138 A.3d 4 (Pa. 2016).

To the extent that Hendricks argues that the evidence to support his conviction for third-degree murder was insufficient, the PCRA court determined there was sufficient evidence to support the conviction.

> I find there was sufficient evidence to sustain the guilty verdict for third degree murder. There was evidence presented that the defendant helped set-up the victim; that he arrived at the victim's house with [] Lont; that he communicated back and forth with both the victim and Lont prior to the shooting; and that he coordinated with Lont to flee the victim's house and subsequently meet up with Lont.

PCRA Ct. Op. at 5 n.4. Because the PCRA court determined that Hendricks' underlying substantive claim does not have arguable merit, and this determination is supported by the record and free of legal error, we need not address the remaining ineffectiveness prongs.

Accordingly, the PCRA court properly denied Hendricks' PCRA petition.

Order affirmed.

Justice Fitzgerald joins in the memorandum.

Judge Shogan filed a concurring/dissenting memorandum

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/11/2017

**IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | No. 3173-2009 |
| vs. | |
| MATTHEW HENDRICKS, | |
| Defendant | |

\* \* \* \* \* \* \* \* \* \*

APPEARANCES:

Jay W. Jenkins, Chief Deputy District Attorney
    On behalf of the Commonwealth

Philip D. Lauer, Esquire
    On behalf of the defendant

\* \* \* \* \* \* \* \* \* \*

## OPINION

On March 18, 2011, following a jury trial, the defendant was found guilty of one count of Murder of the Third Degree[1] and not guilty of Criminal Conspiracy to commit Murder of the First Degree relating to the shooting death of David Rivera. The evidence at trial showed that the shots that killed Mr. Rivera were fired by co-defendant Clyde Lont, who at the time of the defendant's trial had pleaded guilty to Murder of the Third Degree, but had not yet been sentenced. Following the verdict, I ordered a Pre-sentence Investigation Report (PSI), and on May 3, 2011, I sentenced the defendant to a period of confinement of not less than 20 years nor more than 40 years in a State Correctional Institution.

---

[1] 18 Pa.C.S.A. 2502(c)

- 1 -

On May 10, 2011, the defendant filed Post-Sentence Motions consisting of the following: (1) Motion for New Trial based on after-discovered evidence relating to a statement made by Mr. Lont; (2) Motion for New Trial based on trial court error; and (3) Motion for New Trial based on juror misconduct. On August 3, 2011, the defendant made an oral motion for a 30-day extension for decision on the motions, pursuant to Pa.R.Crim.P. 720(B)(3)(b), which I granted. On August 10, 2011, the defendant filed an amended post-sentence motion consisting of a Motion to Reconsider and Modify Sentence. Hearings on the motions were held on August 16, 2011, and September 8, 2011. I took the motions under advisement, and the parties submitted briefs. This opinion follows.

## Summary of the Facts

*Trial Testimony*

On the night of April 20, 2007, Prisilia Bonila was dropping off her friend, Anesha Valez, at Valez's home at 1961 Hillcrest Road in the Parkridge Housing Development in Bethlehem, Pennsylvania. At the time, Bonila's cousin, Tonya Beltran, and Beltran's boyfriend, David Rivera (a.k.a. "D"), lived at 1933 Hillcrest Road. While Bonila was sitting in her car outside Valez's house, a Chrysler 300 with New York plates drove past her heading in the direction of Beltran's residence. The car had tinted windows, so Bonila could not see how many occupants were inside. It was later determined that the Chrysler 300 belonged to co-defendant Clyde Lont (a.k.a. "Doughboy"/ "Dough" or "Fresh").

Ms. Bonila proceeded to leave Ms. Valez's house and drive to Ms. Beltran's house. On the way, Bonila passed the same Chrysler 300 parked on the side of the

- 2 -

road a few houses away from Beltran's house. Bonila pulled into Beltran's driveway and beeped her horn; Mr. Rivera came outside. Bonila asked Rivera if Beltran was home, and Rivera advised she was not. Bonila, referring to the Chrysler 300, asked Rivera if he knew who's car that was, and Rivera said, "no." At that time, Bonila heard Rivera's Nextel phone "chirp" and heard Rivera say, "Is that you?" Bonila did not hear a response. Bonila proceeded to pull out of the driveway and drive in the direction of the Chrysler 300 back towards Valez's residence. When Bonila passed the Chrysler, she observed two figures in the front seats of the vehicle. She then observed a tall, black man exit the rear passenger side of the vehicle and walk towards Beltran's house. The man was wearing a white shirt and a new pair of "Jordan" sneakers. Bonila did not recognize the man.

Ms. Bonila arrived back at Ms. Valez's house and stayed for approximately 5 minutes. She left Velez's and headed out of the housing development, which was in the opposite direction than Ms. Beltran's residence. As she was driving, Bonila observed the same tall, black man walking fast down the street. Ms. Bonila slowed down, asked the man if everything was all right, and asked him if he needed a ride. The man walked up to her car and got into the rear driver's side of Bonila's car. Bonila asked the man if he was ok, and the man said, "[I] don't know what happened; dude needs medical attention." Bonila asked the man his name, but he would not provide it to her. The man was acting agitated and jumpy, so Bonila asked him to get out of her car. Bonila pulled over in front of a McDonald's on Union Boulevard, and the man exited. Bonila did not see where the man went.

- 3 -

Thinking something may be wrong at Ms. Beltran's house, Ms. Bonila called Beltran's house, but the phone was busy. Bonila drove back to Beltran's and pulled up in front. She noticed that the front screen door to Beltran's house was closed, but the inner door was open. Bonila walked up and yelled for Mr. Rivera, but did not get a response. She opened the screen door and started to walk inside. As she did, she saw shell casings on the floor and Rivera's Nextel lying on a rug. She then looked towards the kitchen and saw Rivera lying motionless on the floor. Bonila left the house and called 911. David Rivera was later pronounced dead. His cause of death was due to multiple gunshot wounds, and his manner of death was ruled a homicide.[2]

Following the shooting, sometime after 11:00 PM, Janelle Gordon, Mr. Lont's girlfriend at the time, received a call from Mr. Lont. Lont asked Gordon to go pick up the defendant, Matthew Hendricks (a.k.a. "Shy" or "Stink Ass") at the McDonald's on Union Boulevard and drive him to the Exxon in Easton. Gordon subsequently drove to the McDonald's and picked up the defendant. Gordon saw the defendant wearing a white T-shirt and a hat. When the defendant got into her car, Gordon smelled PCP on his person.[3] Thereafter, she drove the defendant to the Exxon in Easton.

At the Exxon, Ms. Gordon saw the Chrysler 300. She could see that Kadafi Miller was in the driver's seat and Mr. Lont was in the passenger seat. Lont then exited the Chrysler 300 and the defendant exited Gordon's car. The defendant got into the passenger seat of the Chrysler 300 and Lont got into the passenger seat of Gordon's vehicle. Lont also smelled like PCP. Gordon proceeded to drive west on Route 22. During the drive, Lont confessed to shooting Mr. Rivera, and subsequently disposed of

---

[2] Mr. Rivera sustained seven gunshot wounds. Three of the wounds were to Rivera's back, including one contact wound and one fired within close range.
[3] Ms. Gordon was familiar with the smell due to Mr. Lont's use of the drug.

the gun and clip.[4]  Gordon and Lont spent the night in a hotel room. The following morning, Gordon drove Lont to New York, dropped him off, and returned to Pennsylvania.

Gordon and Lont's relationship ended sometime in August 2007. Gordon subsequently spoke with the police, but admittedly withheld information until she testified in front of a grand jury in November 2008. Gordon testified at the defendant's trial that she withheld information because she was scared.

According to Kadafi Miller, on the night of April 20, 2007, he called Mr. Lont and asked to exchange cars with him because it was Friday night and Miller wanted to drive a nicer car. The two met near 11th Street in Easton, and Miller took the Chrysler 300 and Lont took Miller's Acura TL. Miller said his girlfriend at the time, Jennifer Diaz, was with him when he switched cars, and the defendant was not with him.

The Chrysler 300 was low on gas, so Miller drove to a nearby Exxon gas station. When Miller left the gas station, a police vehicle pulled behind him with lights and sirens on. Miller did not pull over, but rather led police on a chase which eventually ended in the 3300 block of Freemansburg Avenue.[5] Miller exited the vehicle and ran to a friend's house next to where he stopped; Ms. Diaz ran to a nearby mini mart.[6] Eventually, the police surrounded the house. While he was inside the house, Defendant Lont called Miller and told him he wanted his car back. Miller has admitted he left money, two phones, and the keys to the Chrysler 300 inside the house. Miller was subsequently

---

[4] The testimony was that Mr. Lont threw the gun clip out of the car on a back road near New Smithville, and threw the gun into the Lehigh River in south Bethlehem.

[5] Mr. Miller advised he ran because he had an outstanding warrant. Due to the high speeds of the pursuit, a tire on the Chrysler 300 popped. Pursuing officers described seeing debris, sparks, and gouge marks in the street. Officers from Easton, Palmer Township, Wilson Borough, and the State Police were involved in the pursuit.

[6] Ms. Diaz testified on behalf of the defendant and indicated she was with Mr. Miller and did flee when he stopped the car.

taken into custody. A leather coat, car keys, a large amount of money, and two cell phones were recovered from the house.

Sergeant William Dosedlo and Lieutenant Mark Diluzio, of the Bethlehem Police Department's Criminal Investigation Unit, were assigned to investigate the shooting death of Mr. Rivera. Through the investigation, Dosedlo learned that the defendant may have been involved in the shooting. On June 13, 2007, Dosedlo and Diluzio went to the Pennsylvania Probation and Parole Department in Allentown to interview the defendant. The detectives met with the defendant and explained that they were investigating the death of David Rivera. The detectives then interviewed the defendant.

During this interview, the defendant told the detectives that on the night of April 20, 2007, he received a phone call at home from Mr. Rivera. Rivera told the defendant that he was sending someone over to pick him up and bring him to Rivera's house in the Parkridge Housing Development. The defendant said he was picked up on the south side of Easton by two females in a white Toyota Corolla. The females drove the defendant to a Spanish store near Rivera's house and dropped him off.[7]

The defendant advised that he walked to Mr. Rivera's residence and the two started watching a Yankees game. A few minutes later, someone knocked on Rivera's door. Rivera went to the door, opened it, and began talking through a screen door to an individual standing outside. The defendant could hear a male voice speaking, but he did not recognize the voice. He also could not hear what the man and Rivera were saying. After a short time, Rivera returned to the living room and continued watching the game.

---

[7] According to the defendant, Mr. Rivera did not want people dropped off in front of his house since he sold drugs from his home.

- 6 -

The defendant told the detectives that at some point he walked into the kitchen and, shortly thereafter, heard the door open and heard several gunshots. The defendant said he ran from the residence out a back door and hid in a section of woods for a few minutes. He then walked to the front of Mr. Rivera's house and observed Ms. Bonila at the front of the residence. He said he yelled to Bonila to get help because Rivera had been shot, and then left the scene.

The defendant was questioned regarding information the detectives had obtained that he went to Mr. Rivera's family's house after the shooting and admitted being involved in Rivera's death. The defendant denied this. When questioned about whether he knew somebody by the nickname Doughboy, the defendant advised that he knew a lot of "Doughboys" and "Doughs", but was not friends with any of them.

During the interview, the defendant began to cry and became very emotional. On two occasions, the defendant vomited into a trashcan. The defendant made statements to the detectives that "it happened so fast" and "he should not have died." The defendant also said that he "would not kill his friend." The interview subsequently ended.

As part of the investigation, detectives obtained subscriber information, incoming and outgoing calls, duration of calls, and originating and terminating cell phone tower information for several cell phones associated with this case. With this information, Detectives learned Mr. Lont utilized a cell phone with telephone number 484-550-0184 and direct connect number 183*620*4212, and the defendant utilized a cell phone with telephone number 215-730-8204 and direct connect number 183*635*3097.[8] The

---

[8] Additionally, the defendant admitted having that phone with him the night of the shooting and admitted making calls with that phone.

- 7 -

phone found with Mr. Rivera's body had a phone number of 718-502-2583 and a direct connect number 176*885*8944. The last number to communicate with Rivera's phone prior to his murder was 183*635*3097, the defendant's number. The records also indicated Lont and the defendant communicated with each other before and after the shooting on the night of April 20, 2011. Additional information showed that the defendant also communicated with Mr. Miller that night.[9]

Finally, DNA evidence linked Mr. Lont to the Chyrsler 300, and fingerprint evidence connected the defendant and Mr. Miller to the Chrysler. Notably, the defendant's fingerprints were found on the exterior of the rear, passenger side door.

The defendant testified at his trial. He advised that on April 19, 2007, he was trying to get PCP, but could not reach any of his contacts. As such, Mr. Miller said he knew someone that could get PCP, and used the defendant's phone to call his contact. Miller and the defendant met with this person to purchase PCP. Miller introduced the man to the defendant as "Fresh," but the defendant testified that he did not know Fresh was Clyde Lont. According to the defendant, the numerous calls from the defendant's cell phone to Mr. Lont's cell phone were made by Miller.

Sometime during the day on April 20, 2007, the defendant met up with Mr. Miller and Fresh to go to a liquor store in Easton. Fresh was driving, and the defendant sat in the back seat, but could not recall what type of car he was in. Later that day, the defendant made plans to go to Mr. Rivera's house to discuss a new car for Rivera. Rivera called the defendant and said he wanted PCP and was sending a girl to pick up the defendant. A female named "Tay" picked up the defendant, dropped him off at a

---

[9] The two phones recovered from the house following Mr. Miller's arrest were associated with phone number 434-634-0095 / direct connect number 168*271897*12 and phone number 610-496-7111 / direct connect number 168*663*5753.

- 8 -

Spanish store near Rivera's house, and the defendant walked to Rivera's house. The defendant said he was wearing a blue hooded sweatshirt and black boots. He arrived at Rivera's house sometime after 10:14 PM, and did not notice a Chrysler 300 in the area.[10] He also testified that he did not arrive to Rivera's in a Chrysler 300 and did not get out of the backseat of a Chrysler 300 at Rivera's.

Inside Rivera's residence, the defendant was on the phone in the kitchen when he heard Rivera talking to someone through the screen door. He then heard the door open and heard gunshots. The defendant dropped the phone, ran out the back door, and hid in some woods for a short time. He then walked around the corner to the front of the house and saw a woman (Bonilla) he thought to be related to Rivera's girlfriend sitting in a car. He ran to the car, got in, and said "D needs medical attention." He believed the woman was acting too "nonchalant," so he got out of the car near the McDonald's on Union Boulevard. The defendant called several people in an attempt to get a ride. He reached a woman named "Tweena," and she subsequently picked him up. According to the defendant, he never saw Janelle Gordon and she did not pick him up that night. The defendant also denied being in a car with Mr. Miller following the shooting and denied meeting up with Mr. Lont in Easton.

Tweena drove the defendant to the workplace of Robert Negron (a.k.a. "Macho"), one of the defendant's friends. Negron was not there, so the two drove to the defendant's house in Easton and the defendant got his own vehicle. The defendant then drove to Negron's house in Bethlehem. Negron, his girlfriend, and their children were at the house. Negron's girlfriend drove everyone back to Rivera's house. The defendant

---

[10] At the time, the defendant believed it was still light outside when he arrived at Rivera's house. However, at trial, he confirmed making calls back and forth from his phone to Rivera's phone between 7:26 PM and 10:14 PM, and said he would not have been calling Rivera while in the house with him.

recalled seeing the police there, but said he did not talk to any officers because he was on state parole and was worried about getting in trouble.

Subsequent to the shooting, the defendant went to the home of Mr. Rivera's mother, Lilliam, and met with Rivera's family and friends. The defendant admitted to the group that he was present when Rivera was shot, but said he did not know who shot Rivera. At trial, the defendant admitted he embellished the story of what happened, specifically telling people that the shooter came in and hit the defendant in the mouth with the gun, chipping his tooth. The defendant said he did this because he believed Rivera's family and friends were upset because he ran following the shooting instead of helping Rivera.

At trial, the defendant admitted he called Mr. Lont while he was at Liliam's house. He stated everyone at the house was looking for drugs, and he recognized Lont's number in his phone as being someone Mr. Miller previously called for drugs using the defendant's phone. According to the defendant, he did not know he was calling Lont.

The defendant testified that he did not shoot David Rivera, he did not have any understanding with anyone else in regard to shooting Rivera, and he did not know anything was going to happen to Rivera on April 20, 2007.

**Post-sentence Motion Hearing – August 16, 2011**

Following the defendant's trial, co-defendant Clyde Lont was sentenced on April 25, 2011. On or about April 30, 2011, the defendant's counsel, Philip D. Lauer, Esquire, received a notarized statement from Mr. Lont regarding the shooting of Mr. Rivera. In the statement, Lont indicated he acted without the assistance, planning, or knowledge

- 10 -

of the defendant. At the defendant's post-sentence motion hearing on August 16, 2011, Lont testified on behalf of the defendant.

Mr. Lont advised that he did not speak to the defendant about killing Mr. Rivera and he did not have any agreement with the defendant to kill Rivera. Lont testified that he in fact had no plan to kill Mr. Rivera when he went to his house on the night of April 20, 2007, and it just happened "spur of the moment." He said Rivera charged at him and tried to take his gun, so he began firing. Lont also stated that he never spoke with the defendant on the phone before that evening, on that evening, or after that evening, and stated the defendant was not with him when he arrived at Rivera's house. Lont testified he left Rivera's with Kadafi Miller, and while they were driving, the defendant called Miller and told him that he was at Rivera's when Rivera was shot. Lont also testified that he and Miller drove to Easton and that he saw the defendant arrive there with Ms. Gordon. Thereafter, he got in the vehicle with Gordon and the defendant got in the vehicle with Miller.

Mr. Lont admitted he pled guilty to criminal conspiracy with the defendant regarding the shooting of Rivera, but stated he only did that because it was part of the deal and he just wanted to get everything over with. He denied confessing to Janelle Gordon and denied disposing of the gun. Lont stated Ms. Gordon got rid of the gun.

Lieutenant Dosedlo also testified at the hearing. Dosedlo indicated he was involved in an interview with Mr. Lont following the shooting. At the interview, Lont denied shooting David Rivera, and told Dosedlo that he only confessed to his girlfriend because he would say things to women in order to manipulate them. Lont also told

- 11 -

Dosedlo that he and Rivera had mutual friends, including Shy, although he did not know Shy's real name.

*Post-sentence Motion Hearing – September 8, 2011*

Gavin Holihan, Esquire, counsel for Clyde Lont, testified that he and Mr. Lont met with Attorney Lauer and the defendant to discuss Mr. Lont testifying at the defendant's trial. At the meeting, Attorney Holihan advised Attorney Lauer that Lont would not testify at the trial, and that if Lont were called as a witness, he would exercise his 5th Amendment right against self-incrimination.

A juror from the defendant's trial (Juror 1) testified that at some point during the trial, a second juror (Juror 2) made a statement in front of all the jurors regarding a possible video Juror 2 had seen. Juror 2 indicated he had seen Mr. Rivera's mother sobbing following another verdict in connection with this case. Based on the statement, Juror 1 assumed Juror 2 had seen some sort of video.

## Discussion and Conclusions of Law

*Motion for New Trial - After-Discovered Evidence*

The defendant asks the court to grant him a new trial based on after-discovered evidence, namely the testimony by Mr. Lont that the defendant was not involved in the planning or commission of the killing of David Rivera.

A new trial may be granted on the basis of after-discovered evidence if the new evidence (1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching a witness; and (4) is of such a nature and character that a different verdict will likely result if a new

- 12 -

trial is granted. *Commonwealth v. Nocero*, 582 A.2d 376, 380 (Pa.Super. 1990). A trial court's decision not to grant a motion for new trial based on after-discovered evidence will not be disturbed on appeal absent a clear abuse of discretion. *Commonwealth v. Parker*, 431 A.2d 216 (Pa. 1981).

Additionally, any post-sentence testimony of jailed accomplices whose sentences have been imposed by the court is looked upon with much disfavor. *Commonwealth v. Lambert*, 603 A.2d 568 (Pa. 1992). A co-conspirator already serving time has little to lose by attempting to free his partner. *Commonwealth v. Tervalon*, 345 A.2d 671 (Pa. 1975).

In the present case, I do not find that the testimony of Clyde Lont constitutes after-discovered evidence warranting a new trial. Initially I note, and the Commonwealth concedes, that the evidence was clearly unavailable at the time of trial since Attorney Holihan advised Attorney Lauer that Mr. Lont would invoke his 5th Amendment right against self-incrimination if called to testify. *Commonwealth v. Fiore*, 780 A.2d 704 (Pa.Super. 2001). However, I do not find the testimony of Mr. Lont to be credible, nor do I find it to be of such a nature that it would result in a different verdict if a new trial were granted.

First, Mr. Lont's testimony contradicts much of the evidence presented at trial. Lont denied confessing to Ms. Gordon and denied disposing of the gun, contrary to the credible trial testimony of Gordon. Lont testified he never spoke with the defendant before or after the shooting, despite the cell phone records indicating multiple calls back and forth between the two men. Notably, the defendant admitted to calling Lont following the shooting in an attempt to purchase drugs. Additionally, Lont testified the

defendant was not with him when he arrived at Mr. Rivera's house, despite the credible testimony of Ms. Bonilla that she saw the defendant exit the rear passenger side of Lont's vehicle, and the fingerprint evidence linking the defendant to the vehicle.

Second, Mr. Lont's testimony contradicts the defendant's own version of events. The defendant maintains that Ms. Gordon did not pick him up following the shooting, that he did not meet up with Mr. Lont in Easton, and that he did not get in a vehicle with Mr. Miller that night. Lont's testimony was that he saw Gordon drop off the defendant in Easton and saw the defendant get into the car with Miller.

Finally, and perhaps most importantly, Mr. Lont's testimony is inherently unreliable. Lont's statements came after he was sentenced for his role in the homicide and therefore had nothing to lose by attempting to free the defendant – his accomplice. In light of all the credible evidence presented at the defendant's trial, I do not find that the addition of Lont's conflicting testimony would result in a different verdict if a new trial were granted. As such, the defendant's motion for a new trial based on after-discovered evidence is denied.

### *Motion for New Trial - Trial Court Error*

#### First Degree Murder Charge

The defendant next alleges that I erred in submitting the charge of first degree murder to the jury because there was no evidence of a specific intent to kill on the part of the defendant.

"A trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict." Commonwealth v. Browdie, 671 A.2d 668, 674 (Pa. 1996). In the instant case,

- 14 -

a charge of first-degree murder was at issue in the defendant's case, and the evidence presented would have supported a guilty verdict to such charge.

> To sustain a conviction for first-degree murder, the Commonwealth must prove, beyond a reasonable doubt, that a human being was unlawfully killed, that the accused was responsible for the killing, and that the accused acted with a specific intent to kill. A defendant may be convicted of first-degree murder on a theory of accomplice liability so long as the facts support the conclusion that the defendant aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intent to promote or commit the offense, *i.e.,* the intentional killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence.

Commonwealth v. Pagan, 950 A.2d 270, 278-279 (Pa. 2008).

The evidence in this case showed that the defendant aided Clyde Lont in killing David Rivera and did so with a specific intent to kill. There was evidence presented that the defendant worked with Lont to set-up Rivera, which included arriving at Rivera's house with Lont just prior to the shooting; communicating with both Rivera and Lont prior to the shooting; coordinating with Lont to flee from Rivera's house; and communicating with and meeting up with Lont following the shooting. From this evidence, the jury could have reasonably concluded that the defendant coordinated with Lont in planning and carrying out the killing of David Rivera, and that the defendant did so with the specific intent to kill Rivera. As such, I did not err in submitting the charge of first degree murder to the jury.

Additionally, even if I were to find that it was an error to submit that charge to the jury, it was harmless. In alleging an error in jury instructions, a new trial is warranted only where such error has been prejudicial to the defendant. *Commonwealth v. May,* 656 A.2d 1335, 1343 (Pa. 1995). It is difficult to see how the defendant was prejudiced

- 15 -

by the inclusion of the first degree murder instruction when the jury did not find the defendant guilty of that charge. As such, a new trial is not warranted.

## Cell Phone Evidence

The defendant also alleges I erred in admitting into evidence information related to the ownership and usage of a cell phone found near David Rivera's body following the shooting.[11] This allegation is wholly without merit.

As regards the admissibility of evidence, the threshold inquiry is whether the evidence is relevant. See Pa.R.E. 402; Commonwealth v. Cook, 952 A.2d 594 (Pa. 2008). Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401.

Whether David Rivera and the defendant communicated via cell phone just prior to Mr. Rivera's murder is certainly relevant in determining whether the defendant aided in the preparation and killing of Rivera. Furthermore, the Commonwealth sufficiently established a link between the cell phone and Rivera. The evidence showed that Pricilla Bonila saw Rivera talking on a Nextel phone just prior to his murder; a Nextel phone with direct connect number 176*885*8944 was found near Rivera's body; in Kadafi Miller's cell phone, direct connect number 176*885*8944 was associated with "D," a nickname David Rivera was known by; and the defendant acknowledged that direct connect number 176*885*8944 was Rivera's. The defendant's allegation does not warrant a new trial.

---

[11] In the defendant's initial brief, he indicated this issue would be addressed in a supplemental brief. However, other than a general allegation that I erred in admitting the evidence, the defendant does not address this issue in his supplemental brief, nor does he indicate he has withdrawn this issue. In the event the defendant is still pursuing this issue, I will address the merits of the allegation.

- 16 -

## Motion for New Trial - Juror Misconduct

When a court is made aware that a juror has been exposed to extraneous information, which may have affected the juror's deliberation, the trial court must assess the prejudicial effect of such influence. *Commonwealth v. Messersmith*, 860 A.2d 1078, 1085 (Pa.Super.2004). In making this assessment, a court should consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.* "Only when there has been prejudice to the accused does an act of juror misconduct require the granting of a new trial." *Commonwealth v. Flor*, 998 A.2d 606, 639 (Pa. 2010).

The court may not consider the subjective impact the influence had on the juror, but must determine how an objective, typical juror would be affected by such an influence. *Messersmith*, 860 A.2d at 1085. The burden of proving that the extraneous influence was prejudicial is on the moving party. *Id.* at 1086.

In the case *sub judice*, Juror 1 testified that she was made aware that Juror 2 may have seen a video of David Rivera's mother sobbing during another proceeding in this matter. Juror 1 could not offer any further details on this incident. In fact, Juror 1 assumed it was a video that Juror 2 was referring to based on his statement that he had seen Rivera's mother sobbing. Even assuming Juror 2 had in fact seen a video in regard to this case, I find it difficult to conclude that it was prejudicial. It is not alleged the video was played in the deliberation room, and outside the brief statement made by Juror 2, the incident was not again discussed among the jurors. The potential

- 17 -

extraneous information was at best "vague, ambiguous and brief." *See Commonwealth v. King*, 990 A.2d 1172 (Pa.Super. 2010). I find the defendant has failed to prove that such information would have affected the deliberations of an objective juror. The defendant's motion for a new trial is denied.

### *Motion for New Trial – Denial of Motion for Mistrial*

In his post-sentence motions, the defendant alleges I erred in denying his motion for mistrial following testimony from Sergeant Dosedlo concerning the fact that Mr. Lont pleaded guilty to criminal conspiracy. The testimony at issue arose when Sergeant Dosedlo was recalled to the stand during the defendant's case-in-chief. During questioning by the defendant's counsel, the following exchange took place:

> Q [Attorney Lauer]: You agree, don't you, that Clyde Lont has admitted to shooting David Rivera?
>
> A [Dosedlo]: Yes. He also admitted to being in a conspiracy with your client.

Immediately following this, Attorney Lauer objected and made a motion to strike. I sustained the objection, granted the motion to strike, and instructed the jury to disregard the latter portion of the witness's testimony. Thereafter a sidebar discussion took place and Attorney Lauer moved for a mistrial. The jury was subsequently dismissed and the parties made arguments on the motion for mistrial. Thereafter, I denied the defendant's motion. When the jury was brought back in, I gave the following curative instruction to the jury:

> Yesterday, Detective Dosedlo made a comment that is not proper evidence in this case, and I will ask you to recall that comment. It was objected to by Attorney Lauer, and I sustained the objection, and I granted his motion to strike. In no way, shape, or form are you to consider this as

- 18 -

evidence against the defendant concerning the charges in this case. You are to totally disregard that testimony.

After giving the curative instruction to the jury, the defendant continued with his case-in-chief.

As regards the denial of a motion for mistrial, our courts have said:

A mistrial is an 'extreme remedy ... [that] ... must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial.' A trial court may remove taint caused by improper testimony through curative instructions. Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate.

*Commonwealth v. Bracey*, 831 A.2d 678, 682 (Pa.Super. 2003) (citations omitted). "The law presumes that jurors will follow the trial court's instructions." *Commonwealth v. Gillen*, 798 A.2d 225, 231 (Pa.Super. 2002).

While the remark did come from the police prosecutor in this case, it was not elicited by the Commonwealth, nor was it exploited by the Commonwealth.[12] The remark was certainly nonresponsive to the question, but I do not believe it was of such a nature that it could not be corrected with a curative instruction. I believe striking the testimony from the record and providing a curative instruction was the appropriate course of action, and a mistrial was not warranted. Furthermore, I find the comment did

---

[12] It is worth noting that just prior to the remark in question, Attorney Lauer asked Sergeant Desedlo the same question and the attorney for the Commonwealth, Attorney Jay Jenkins, objected and asked to approach. In a sidebar discussion, Attorney Jenkins advised the court that he was concerned that the question by Attorney Lauer would open the door to what Mr. Lont pled guilty to. Despite the concern raised by Attorney Jenkins, Attorney Lauer decided to proceed with the question.

not prejudice the defendant considering the jury found the defendant not guilty of criminal conspiracy. As such, the defendant's motion is denied.

## Motion to Reconsider and Modify Sentence

The defendant next alleges the sentence imposed was excessive under the circumstances and asks for a modification of sentence. I find the defendant's allegation to be without merit.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Johnson*, 961 A.2d 877 (Pa.Super. 2008).

> In order to constitute an abuse of discretion, a sentence must either exceed the statutory limits or be so manifestly excessive as to constitute an abuse of discretion. Further, a sentence should not be disturbed where it is evident that the sentencing court was aware of sentencing considerations and weighed the considerations in a meaningful fashion.

*Commonwealth v. Miller*, 965 A.2d 276, 277 (Pa.Super. 2009) (citations omitted). When a court has the benefit of reviewing a PSI, "it is presumed that the sentencing court 'was aware of the relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors.' " *Commonwealth v. Tirado*, 870 A.2d 362, 368 (Pa.Super. 2005) (citations omitted).

I submit I did not err in sentencing the defendant to a period of incarceration of 20 to 40 years in a state correctional institute. In sentencing the defendant, I took into account all the information available to me at the time, including the PSI report, the witnesses presented, and the arguments of counsel. Additionally, I considered the need to protect the community, the gravity of the offense for which the defendant was found guilty, and the rehabilitative needs of the defendant. Pa.C.S.A. § 9721(b). At the time of

sentencing, the defendant had a prior record score of 3 and the charge carried an offense gravity score of 14. The standard range minimum was 129 to 240 months.

Taking into consideration all the information available to me at sentencing, I did not abuse my discretion in sentencing the defendant. The defendant's motion is denied.

### Conclusion

Based on the foregoing reasons, the defendant's Post-Verdict Motions are without merit and are therefore denied.

October 6, 2011

_____
James T. Anthony, Judge

- 21 -