J-S07010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                        :               PENNSYLVANIA
                                                        :
                          v.                            :
                                                        :
                                                        :
                                                        :
DELONTE HAYNES                         :
                                                        :
                    Appellant                    :   No. 979 WDA 2020

Appeal from the Judgment of Sentence Entered November 15, 2019
In the Court of Common Pleas of Westmoreland County Criminal
Division at No(s):  CP-65-CR-0000534-2018

BEFORE:  SHOGAN, J., DUBOW, J., and KING, J.

MEMORANDUM BY SHOGAN, J.:                          **FILED: MAY 26, 2021**

Appellant, Delonte Haynes, appeals from the judgment of sentence entered on November 15, 2019, after he was convicted by a jury of rape of a child, involuntary deviate sexual intercourse, indecent assault, and corruption of minors.[1]  After review, we affirm.

The trial court set forth the factual and procedural history underlying Appellant's convictions as follows:

> [Appellant, a twenty-two-year-old man,] was charged with rape of a child, involuntary deviate sexual intercourse, indecent assault, and corruption of minors, alleged to have been committed against his young cousin, I.H.  I.H. testified that he used to live in Pennsylvania with his mother, N.H., his mother's boyfriend, and [Appellant] at a residence in the Arnold/New Kensington area.  During that time, I.H. attended school at Mary Queen of Apostles school.

---

[1] 18 Pa.C.S. §§ 3121(c), 3123(b), 3126(a)(7), and 6301(a)(1)(ii), respectively.

[Appellant] is I.H.'s cousin, as he is the son of N.H.'s sister. . . . [Appellant] slept on the third floor of the residence in an attic bedroom and I.H. had a second floor bedroom. I.H. and [Appellant] were sometimes alone in the house, when I.H.'s mother and her boyfriend were at work. They would play games on I.H.'s Playstation or [Appellant] would help with I.H.'s homework.

When I.H. was eight or nine years old, [Appellant] began showing him heterosexual and homosexual pornography on [Appellant's] phone. [Appellant] began to touch I.H. as they were watching the pornography. He started by touching I.H.'s leg, but the touching escalated. [Appellant] "put his penis inside of me sometimes." I.H. testified that "it would hurt" and he would try to push him off. I.H. would put his mouth on [Appellant's] penis. [Appellant] would touch I.H.'s penis with his hands. [Appellant] kissed I.H. with his tongue. The sexual contact occurred in I.H's bedroom, the living room or in the attic.

I.H. testified that "it happened every day." Sometimes I.H. would tell him to stop, but [Appellant] would call him names, calling I.H. a "bitch" and a "faggot." The last time the abuse occurred was when I.H. was ten years old.

He eventually told his mother that [Appellant] had showed him pornography, after she found I.H. watching pornography in his bedroom. He did not tell her, at first, that anything else happened, because he was scared. He would not have told anyone if his mother had not found him "watching the movie," because he didn't want anyone to know and "didn't want anyone making fun of me." Eventually, however, he told his mother what happened between him and [Appellant], and his mother called the police.

I.H. testified that [Appellant] left the residence and went somewhere else to live. He wanted [Appellant] to leave because "I wanted him to stop." The abuse did not continue after [Appellant] left the house, although I.H. saw him occasionally after he left.

I.H. "did not want to do these things with [Appellant]," "did not agree to do these things with [Appellant]," that "he

- 2 -

told him to stop" and he was "embarrassed about these things."

N.H., the mother of I.H., testified that she previously lived on Sixth Avenue in Arnold, Pennsylvania. [Appellant] had lived with N.H. on one previous occasion when he was approximately 16 years old. He returned to live with her and I.H. in the Fall of 2014, when [Appellant] was in his 20s. [Appellant] lived with N.H., I.H. and N.H.'s boyfriend "until N.H. kicked the boyfriend out and then it was just [N.H., Appellant,] and I.H." [Appellant] stayed in the finished attic, while I.H. had a bedroom on the second floor. There were times when [Appellant] was alone with I.H. [Appellant] lived with N.H. for "maybe four months." N.H. "kicked him out" because "he was showing behaviors that I didn't allow in my house and he was acting weird with I.H." He stayed until "late January, maybe February" of 2015.

After [Appellant] left her residence, [N.H.] saw him occasionally. She and I.H. moved to Dorseyville and I.H. was attending Fox Chapel schools. During that time, she "caught I.H. looking at porn" and asked I.H., "How do you even know about porn?" She was expecting to hear from his friends and "he told me his cousin" and "I asked what cousin?" "He said L.A., which is [Appellant]." She asked I.H. if "anything else happened when you were looking at porn" and he said, "No, Mom, no, mom." She did not believe I.H. and asked "did he touch you?" I.H. told her [Appellant] "touched him on his penis." I.H. did not reveal any further sexual contact with [Appellant] until N.H. "lied to I.H. I told him that I'm going to have the police set him up on a lie detector test and they're going to be able to tell me whether he is lying if anything else happened with [Appellant], and if they tell me anything then you are going to be in trouble if you don't tell me what else happened." I.H. then revealed to his mother that [Appellant] had "tried to penetrate him" and "that [Appellant] put his mouth on him and that he put his mouth on [Appellant] and that this happened quite often."

After I.H. revealed the sexual contact with [Appellant] to her, she "absolutely" asked her son about "everybody," "including uncles, cousins, friends of the family. . . I asked him about anybody he came into contact with." I.H. "said no one else" had touched him.

- 3 -

* * *

Chief Eric Doutt, currently the Chief of Police for the city of Arnold, testified that he has been a police officer for over 29 years. He received the initial report regarding [Appellant] on October 12, 2017, when N.H. came to the Arnold Police Station. Initially, N.H. reported the incident "that occurred with [Appellant] and her son in 2009-2010." After interviewing N.H., however, "it was determined it occurred a few years later."

The Commonwealth entered Exhibit 2, a certified record from the Superior Court of the District of Columbia, showing a conviction of [Appellant] for Attempted First Degree Child Sex Abuse. The Commonwealth entered Exhibit 3, a factual proffer in support of the guilty plea from the District of Columbia, which was signed by [Appellant] and defense counsel, David Maxted, Esq., on 6/23/16.

* * *

[Appellant] testified that N.H. is his aunt and I.H. is his cousin. He lived with N.H. the first time in 2006-2007 when he was 14 years old and the second time when he was 21. The second time he lived with her was for a couple of months.

He testified that the first time he lived with his aunt, N.H., she would "beat me. Like, strip me naked every time. And she would beat me with a belt" if he did not complete his chores. He lived there for approximately a year and a half. His mother came to get him and he moved back to Washington D.C. "when he was 15 and he came back to New Ken when he was 20, 21." He lived with N.H., I.H. and N.H.'s boyfriend. He was "pretty sure" it was 2014 when he moved back to New Kensington. He worked two jobs and was left alone with I.H. "not that often." He testified that he did not show I.H. pornographic videos, did not touch him inappropriately, did not kiss him on the mouth, did not ask him to touch his penis or perform oral sex and never tried to place his penis in his buttocks. He testified that he entered the plea in Washington, D.C. because "something did happen with that person." However, with I.H. "nothing didn't (sic) happen. I didn't do anything. I'm not guilty. This is made up." He denied ever inappropriately touching his cousin, I.H.

- 4 -

He testified that he was not left at home with I.H. and N.H. did not work at that time. She was "always home." N.H. asked him to move out, not because they had a disagreement, but because she didn't like who he was hanging out with.

\* \* \*

Appellant was charged by criminal complaint on January 8, 2018 with rape of a child, involuntary deviate sexual intercourse, indecent assault[,] and corruption of minors . . . The Commonwealth filed a notice of intent to present evidence pursuant to [Pa.R.E.] 404(b) on or about June 28, 2019. [Appellant] filed a Motion in Limine on August 7, 2019, which included a motion to bar evidence. The motions were heard by this court on August 8, 2019, wherein the court denied [Appellant's] motion in limine and granted the Commonwealth's motion.

Jury selection commenced August 5, 2019 before the Honorable Rita D. Hathaway. Trial commenced on August 8, 2019, and the jury returned a verdict of guilty on all counts on August 9, 2019. [Appellant] was sentenced on November 15, 2019 to an aggregate sentence of 12 to 34 years' incarceration. On December 2, 2019, [Appellant] timely filed a notice of appeal to the Pennsylvania Superior Court.

Trial Court Opinion, 2/3/20, at 1–12 (record references and footnotes omitted).

Appellant raises the following issues for this Court's consideration:

1. Did the Trial Court err in permitting the Commonwealth to introduce evidence of a conviction which occurred in time after the events of the instant case making it impossible for the conviction to be considered a prior bad act under Rule 404(b) of the Pennsylvania Rules of Evidence?

2. Did the Trial Court err in permitting the Commonwealth to read into the record the facts included in the Appellant's guilty plea in the Superior Court of Washington D.C. over the objections of defense counsel that the prejudicial nature of the information outweighed the probative value to the Jury?

- 5 -

3. Did the Trial Court err in denying Appellant's motion for a mistrial after 8 of 14 jurors had observed a Commonwealth witness engage in a verbal altercation with the mother of [Appellant] over the lunch recess on the first day of trial?

4. Did the Trial Court err in replacing juror number 2, over defense counsel's objection, prior to deliberations after juror number 2 related to the Court that he believed that a witness had lied during their testimony on the Commonwealth's case in chief?

Appellant's Brief at unnumbered 8.

Appellant's first two allegations of error involve the admissibility and specifics of Appellant's District of Columbia conviction. At trial, through the testimony of Chief Eric Doutt, the Commonwealth entered Exhibit 2, a certified record from the Superior Court of the District of Columbia, showing a conviction of Appellant for attempted first degree child sex abuse, *see* N.T., 8/8/19, at 184, and Exhibit 3, a factual proffer in support of Appellant's guilty plea to that offense signed by Appellant and his defense counsel. *Id.* at 185.

The factual proffer read:

[H]ad case 2016 CFI 1690 proceeded to trial, the Government's evidence would have proven beyond a reasonable doubt that on or about October 8, 2015, within the District of Columbia, [Appellant] engaged in a sexual act with I.S., a 13 year-old, that is penetration of I.S.'s anus by [Appellant's] finger. The 23-year-old [Appellant] was a friend of I.S.'s family and was living with them in October of 2015 in Southeast, Washington D.C. [Appellant] and I.S. were sleeping in the same bedroom. On October 8, 2015, I.S. woke up late for school. When his mother asked him about it, I.S. told her that he missed his alarm clock. Later that morning, I.S. wrote his mother a letter explaining that

the reason he got up late was because [Appellant] had woken him up the night before by licking I.S.'s anus and scrotum. During a subsequent forensic interview, I.S. disclosed that he woke up to [Appellant] moving his . . . front part back and forth with [Appellant's] fingers in his anus. I.S. disclosed that he wrote a letter about what happened to his mother because he was tired of [Appellant] touching him. [Appellant] was arrested and provided a statement to law enforcement. During his statement, [Appellant] acknowledged that he had been sexually abusing I.S. for an extended period of time. [Appellant] expressed remorse and was cooperative with law enforcement.

N.T., 8/8/19, at 185–186.

While Appellant initially contended that the evidence of District of Columbia conviction should not be heard by the jury because it occurred subsequent to the crimes at issue, *see* N.T., 8/8/19, at 24, Appellant now concedes that "'crimes, wrongs, or acts that occur after the offense *may* be admitted.'" Appellant's Brief at unnumbered 12 (quoting **Commonwealth v. Wattley**, 880 A.2d 682, 687 (Pa. Super. 2005) (Appellant's emphasis added)). Appellant now urges that because the only similarities in the two cases were the "ages of the alleged victims and that they may have been sexually assaulted in different manners," the trial court "relaxed the standard to admit evidence of other bad acts and therefore abused its discretion." Appellant's Brief at unnumbered 13. Since analysis of this claim is interwoven with Appellant's second argument that the factual proffer in support of Appellant's guilty plea was inadmissible because the prejudicial nature of the information outweighed the probative value to the jury, we address the issues together.

It is well settled that the admissibility of evidence is left to the sound discretion of the trial court, and a reviewing court will not disturb an evidentiary ruling absent an abuse of that discretion. ***Commonwealth v. Arrington***, 86 A.3d 831, 842 (Pa. 2014). Furthermore, under Pa.R.E. 404(b),[2] evidence of "other crimes, wrongs, or other acts" is inadmissible solely to show a defendant's bad character or his propensity for committing criminal acts. Pa.R.E. 404(b)(1); ***Commonwealth v. Kinard***, 95 A.3d 279, 284 (Pa. Super. 2014) (*en banc*) (citing ***Commonwealth v. Brookins***, 10 A.3d 1251, 1256 (Pa. Super. 2010)). Other crimes evidence is admissible, however, when relevant for another purpose, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. ***Kinard***,

_____

[2]  Pa.R.E. 404(b) provides:

**(b) Crimes, Wrongs or Other Acts.**

> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

95 A.3d at 284; Pa.R.E. 404(b)(2). Such evidence may be admitted, however, "only if the probative value of the evidence outweighs its potential for unfair prejudice." **Kinard**, 95 A.3d at 284; Pa.R.E. 404(b)(2).

Regarding common plans and schemes under Rule 404(b), this Court has instructed:

> When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

**Commonwealth v. Tyson**, 119 A.3d 353, 358-359 (Pa. Super. 2015) (quoting **Commonwealth v. G.D.M., Sr.**, 926 A.2d 984, 981 (Pa. Super. 2007)).

The trial court provided the following reasoning for admission of Appellant's District of Columbia conviction:

> The facts in the case in Washington D.C. are "markedly similar" to the present case. In both cases, [Appellant] resided with the victim as a guest of the household. The abuse was alleged to have occurred between the months of October, 2014 and January, 2015 in the instant case and in October of 2015 in the Washington, D.C. case, approximately ten months after he left his aunt's residence, thus occurring less than a year after the abuse alleged in the instant matter. In the instant case, the victim was male, less than 13 years of age and the abuse included inappropriate touching of the victim's penis and oral and anal intercourse. Likewise, in the Washington, D.C. matter, the victim, was male, 13 years of age and the alleged abuse included [Appellant] "licking I.S.'s anus and scrotum" and the victim being woken up "to [Appellant] moving his 'front part' back and forth with [Appellant's] fingers in his anus." In the instant matter, the abuse often occurred in the victim's bedroom, as it did in the Washington, D.C. case. The [c]ourt, in deciding to admit the evidence, noted the similarities between the two cases. The [c]ourt stated, "The fact that you had one child 13, that the actor was either a relative or befriended the family, so that the family trusted him enough to allow him to live with the family and allowed him access to the child unsupervised and that he performed these sex acts on the child." The [c]ourt also noted that it was a "certified copy of the factual proffer. [Appellant] signed that, his attorney signed it and we have the sentence of the court." The court indicated that [it] would give a limiting instruction to reduce the risk of prejudicing the jury and did give such instruction. The [c]ourt also did not permit the exhibits to go out with the jury. Finally, while Rule 404(b) evidence typically involves what is commonly known as "prior bad acts," the rule is clear that "evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence "may be admissible for another purpose, such a proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident."

- 10 -

* * *

Finally, this [c]ourt balanced the probative value of the evidence and found it outweighed its potential for unfair prejudice.

As the evidence was probative of a common scheme or plan, this court did not err and the admission of [Appellant's] conviction and factual proffer in support of the guilty plea was proper.

Trial Court Opinion, 2/3/20, at 17–19 (record references, footnotes, and internal citations omitted).

We agree with the trial court that the District of Columbia conviction and the related proffer were not offered solely to prove Appellant's character "in order to show that on a particular occasion [Appellant] acted in accordance with the character." Pa.R.E. 404(b)(1). Instead, as the trial court properly held, the conviction and proffer were highly relevant to show Appellant's common scheme, plan, or design under Pa.R.E. 404(b)(2). First, the two incidences occurred within ten months of one another. Additionally, in both instances, Appellant was a guest in a home where the victims resided and the sexual abuse took place therein. The victims were young males and the abuse took the form of anal penetration by Appellant's finger or penis. Given the shared characteristics of each occurrence, the evidence fell within the purview of Pa.R.E. 404(b)(2). *See, e.g., Commonwealth v. Aikens*, 990 A.2d 1181, 1185-1186 (Pa. Super. 2010) (allowing evidence of earlier rape of older daughter in trial for rape of younger daughter where victims were of like ages at time of assault, both were the defendant's daughters, the assaults occurred

during overnight visits in his apartment, and the defendant began by showing the victims pornographic movies); ***Commonwealth v. O'Brien***, 836 A.2d 966, 970 (Pa. Super. 2003) (finding a common scheme and allowing evidence of prior assaults where each assault was on a white boy between the ages of eight and eleven; the boys met the defendant because he was friends with their parents; each crime was committed in the defendant's home, and defendant showed pornography to his victims.). Accordingly, the trial court did not abuse its discretion in admitting the evidence from the District of Columbia conviction under Pa.R.E. 404(b)(2).

We also agree with the trial court's finding that the probative value of the District of Columbia conviction outweighed its potential for prejudice. In every case under Rule 404(b), a court must balance the potential prejudicial impact of the evidence with such factors as "the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations." ***Tyson***, 119 A.3d at 359 (quoting ***G.D.M., Sr.***, 926 A.2d at 987). Here, the District of Columbia conviction was, as explained above, extremely relevant to show Appellant's common scheme, plan, or design in befriending, and then assaulting, I.H. Further, the Commonwealth had a need for this evidence because Appellant denied I.H.'s allegations. Therefore, the Commonwealth's case against Appellant depended, in large

measure, upon I.H.'s credibility and evidence that Appellant engaged in a common scheme, plan, or design with the District of Columbia victim tended to corroborate I.H.'s version of the events. Thus, although detrimental to Appellant, the District of Columbia conviction did not pose the risk of duplicative evidence which could muddle the issues or mislead the jury. On this point, the potential prejudice from the admission of the challenged evidence was lessened by the trial court's pointed jury instruction on the matter: this is because "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." ***Commonwealth v. Hairston***, 84 A.3d 657, 666 (Pa. 2014) (quoting Pa.R.E. 403 cmt) (noting that jurors are presumed to follow the court's instructions). Herein, the court emphasized that the evidence of the conviction and proffer was before the jury for the limited purpose:

> of tending to show a common scheme or plan by [Appellant].
> This evidence must not be considered by you in any way
> other than for that purpose that I just stated. You must not
> regard this evidence as showing that [Appellant] is a person
> of bad character or criminal tendencies from which you might
> be inclined to infer guilt in this case.

N.T., 8/9/19, at 286–287. As a jury is presumed to follow jury instructions, this lessened the prejudicial effect of the statements. Accordingly, we conclude that Rule 404(b) militates in favor of admission of Appellant's subsequent child sexual abuse conviction.

Appellant's third and fourth issues are also connected. Appellant asserts that the trial court erred in denying his motion for a mistrial based on an

altercation outside the courtroom observed by some of the jurors. Appellant's Brief at unnumbered 15. He further avers that the trial court abused its discretion when it discharged Juror Number Two who witnessed the incident. *Id.* at 17.

As described by the trial court, the following occurred on the first day of trial:

> On August 8, 2019, the first day of the trial testimony, during the lunch hour, an altercation involving members of [Appellant's] family and the victim's family occurred. An in camera hearing was held for the jurors who indicated that they saw or heard something unusual. Juror number 2 testified that he observed "an altercation between [the victim's mother]," and "what appeared to be relatives of hers on the sidewalk." "I heard N.H. walk up to one of those people and say 'your son is a rapist.' They had words with each other. There was some pushing and shoving." He testified the police arrived and separated the parties. He did not hear what the woman said in reply. He did not discuss it with any of the other jurors and believed he could still be fair and impartial after witnessing the incident. Juror number 3 testified that she was walking down the street from lunch back to the courthouse and she "actually heard more than saw the confusion that was across the street." She saw the "mom," who "seemed to be yelling with siblings." She "was yelling her son is a rapist." When asked whether she understood whatever N.H. yelled or did not yell would be her own personal thoughts, having nothing to do with the evidence in this trial, [J]uror number 3 responded, "I have siblings. I understand." She testified that, given what she saw and heard, she believed that she could still be fair and impartial as a juror. Juror number 5 testified that she was "just sitting outside in the front" and heard and saw arguments between the I.H.'s mother and I.H. was "just trying to stop her from shouting." She did not hear what she was shouting. She observed [N.H.] run across the street and verbally fight with other people who were sitting outside. [Juror number 5] was sitting with other jurors when this occurred, but did not discuss it with them. She testified that she could be a fair and impartial juror after what she observed and that she could disregard it, knowing that it was the emotion of one witness. Juror number 7 testified that she was sitting with

- 14 -

other jurors out front of the courthouse when she saw I.H. and his mother, sifting on the bench. She observed the mother saying something and I.H., covering her mouth, "trying to quiet her," and "there was a little bit of commotion directly across the street." She did not hear "any specific words." She believed that she could be a fair and impartial juror and disregard what she saw. Juror number 9 testified that she was sitting at a table with some of the other jurors when she saw "N.H. on the corner, screaming at some people in front of the restaurant we just came out. You couldn't understand anything. . . . [S]he went across and there was a scuffle." The jurors she was with "just got up, came in. . . [.]" She testified that she could still be a fair and impartial juror. Juror number 11 testified that she was sitting on a bench outside and the woman who had just testified "started to scream across the road to four other people eating lunch that they support a pedophile and a rapist." She "eventually stood up and walked across the street." "They were yelling and screaming at each other." Juror number 11 testified that she could still be a fair and impartial juror. Juror number 12 testified that he was walking back to the courthouse and "didn't really see much of anything." He "just heard some really loud noises, some commotion coming to my right." Shortly thereafter, he was walking into the courthouse and heard sirens and saw a police car pull up. He didn't see or hear who was involved or what they were saying. He testified that he could still be a fair and impartial juror. Juror number 14 testified that she was sitting at a table outside of the courthouse with another juror. She heard yelling and saw N.H. walking across the street. "There was more yelling and they started fighting so we came inside." The only thing she was able to make out was "I believe you should be ashamed of yourself. That's the only thing I heard." She testified that she could continue to be a fair and impartial juror. Counsel for [Appellant] moved for a mistrial at the conclusion of the in camera hearing, which was denied.

Trial Court Opinion, 2/3/20, at 8–11 (record references omitted).

"The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a flagrant abuse of discretion." *Commonwealth v. Manley*, 985 A.2d 256, 266 (Pa. Super. 2009) (quotation omitted). A trial court will grant a mistrial only "where the incident upon

- 15 -

which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Chamberlain*, 176, 30 A.3d 381, 422 (Pa. 2011).

When a trial court becomes aware that a juror has been exposed to extraneous information which may affect a juror's deliberation, the trial court must assess the prejudicial effect of the outside influence. *Commonwealth v. Pope*, 14 A.3d 139, 145 (Pa. Super. 2011) (citing *Commonwealth v. Messersmith*, 860 A.2d 1078, 1085 (Pa. Super 2004)). We recognize that "[a]n extraneous influence may compromise the impartiality and integrity of the jury, raising the specter of prejudice." *Commonwealth v. Sneed*, 45 A.3d 1096, 1115 (Pa. 2012) (citation omitted). It is axiomatic that "[a] defendant has the right to have his or her case heard by a fair, impartial, and unbiased jury and *ex parte* contact between jurors and witnesses is viewed with disfavor." *Commonwealth v. Tharp*, 830 A.2d 519, 532 (Pa. 2003) (citation omitted).

> There is, however, no *per se* rule in this Commonwealth requiring a mistrial anytime there is improper or inadvertent contact between a juror and a witness. Whether such contact warrants a mistrial is a matter addressed primarily to the discretion of the trial court. A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to have deprived the moving party of a fair and impartial trial.

*Id.* at 532–533 (internal citations omitted).

- 16 -

The relevant inquiry is whether the extraneous influence caused a reasonable likelihood of prejudice. In making the reasonable likelihood of prejudice determination, the court must consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. The burden is on the party claiming prejudice.

*Sneed*, 45 A.3d at 1115 (internal quotations and citations omitted).

The trial court explained that the jurors' observations of the altercation outside the courthouse did not mandate a mistrial:

While the argument outside the courthouse was unfortunate, the court carefully, out of the presence of the remainder of the jury, individually, and, on the record, interrogated each and every one of the jurors who had any knowledge of the incident. The [c]ourt, after such interrogation, was satisfied that each of the jurors had candidly and forthrightly disclosed what he or she had observed and, without reservation, affirmed his or her ability to set it aside and decide the case according to the facts and the law. Here the court properly exercised its discretion and determined that a mistrial was not warranted.

Trial Court Opinion, 2/3/20, at 20.

Although Appellant acknowledges that the empaneled jurors questioned about the incident represented that they could remain fair and impartial, Appellant "believes that this incident, wherein a Commonwealth witness, the mother of the alleged victim whom had just testified . . . attacked the mother of the Appellant verbally and possibly physically on the street referring to the Appellant as a rapist and pedophile, was an incident of such a severe nature" that Appellant could not receive a fair trial. Appellant's Brief at 17.

Our review of the record compels us to disagree. We must defer to the trial court's credibility determinations. **See Commonwealth v. Kennedy**, 218 A.3d 420, 424–425 (Pa. Super. 2019) ("The trial court is in the best position to gauge potential bias[,] and we defer to the trial court when the grounds for the mistrial relate to jury prejudice.") (quotation omitted). While Appellant asks this Court to disturb the trial court's credibility assessment of the jurors, we may not do so under this record. The trial court interviewed the jurors exposed to the extraneous influence individually and outside the presence of any other jurors and was satisfied that the jurors could remain impartial. The transcript of the *in camera* juror interviews clearly demonstrates that Juror Numbers 3, 5, 7, 9, 11, 12, and 14 would be able to set aside what they had witnessed and render a verdict that was fair and impartial.[3] **See** N.T., 8/8/19, at 137 (Juror Number 3 assuring the trial court that she could remain impartial); **id.** at 139 (Juror Number 5 affirming that she could be fair and impartial after what she observed); **id.** at 142 (Juror Number 7 responding in same manner as Juror Number 5); **id.** at 144–145, 147–148 (Juror Numbers 9, 11, 12 and 14 representing that they could remain impartial).

In **Commonwealth v. Szakal**, 50 A.3d 210 (Pa. Super. 2012), this Court held that the trial court did not abuse its discretion in denying an

---

[3] The trial court's interviews with Juror Number 2 are discussed *infra*.

appellant's motion for mistrial as a result of improper contact between jurors and a Commonwealth witness. *Id.* at 220. Therein we reasoned as follows:

> [T]he trial court conducted a colloquy of the jury to determine what, if anything, each juror heard and whether the incident affected his or her ability to be fair and impartial. The colloquy revealed that only Juror No. 715 heard [the Commonwealth's witness's] comments. Each juror, including No. 715, indicated that his or her impartiality was not affected by the outburst. The trial court found the jury's assurances credible.

*Id.* We reach the same conclusion in the instant case.

Further, in his attempt to establish prejudice, Appellant offers only his personal opinion that the jurors disingenuously represented to the trial court that they could remain impartial. However, the trial court, as the judge of their credibility, determined that the jurors were able to disregard anything that they observed of the altercation and render a fair and impartial decision. We will not disturb the trial court's credibility determination that the jurors' deliberations would not be compromised by what they witnessed outside of the courthouse. *See Commonwealth v. Cosby*, 224 A.3d 372, 426–427 (Pa. Super. 2019*), appeal granted in part,* 236 A.3d 1045 (Pa. 2020) (We are bound by the trial court's credibility determination of juror's testimony). Accordingly, for the reasons expressed above, we discern no abuse of discretion by the trial court in denying Appellant's motion for a mistrial.

Finally, Appellant argues that the trial court abused its discretion in discharging Juror Number 2. This juror also witnessed the altercation outside of the courthouse and indicated in his August 8, 2019 *in camera* interview that

he could still be fair and impartial. N.T., 8/8/19, at 134. However, at the conclusion of the trial testimony on the following day, Juror Number 2 asked a member of the trial court's staff if he could discuss what he observed the preceding day. N.T., 8/9/19, at 254. The trial court held another *in camera* hearing wherein Juror Number 2 testified that "based on what I saw yesterday, I have drawn a conclusion that the testimony I heard was false." **Id.** He did not identify whose testimony he believed was false. However, the juror confirmed to the trial court that he could "put it out of his mind." **Id.** at 255. Over Appellant's objection, the trial court dismissed Juror Number 2 and replaced him with Juror Number 13 because Juror Number 2 "made a conclusion that some testimony was false today based on what [he] saw yesterday." **Id**. at 256. The trial court further explained:

> In contradistinction to the jurors previously mentioned . . ., Juror number 2 demonstrated that he could not set aside what happened outside the courtroom and that the scenario he had seen the day before was now driving his credibility determination in the courtroom. This was not, and could not, be countenanced and the juror was properly excused and an alternate inserted in his stead. This court's disqualification of Juror Number 2 in no way deprived [Appellant] of a fair and impartial trial, and in fact was done so that both the Commonwealth and [Appellant] would be assured of fairness and impartiality.

Trial Court Opinion, 2/3/20, at 21–22.

Appellant maintains that the trial court abused its discretion in discharging Juror Number 2 because "there is nothing in the record to indicate that the juror's ability to perform his duty was impaired." Appellant's Brief at unnumbered 18. Appellant further asserts that it "does not stand to reason

- 20 -

that while Juror 2 had said regarding two separate incidents that he could put what he saw out of his mind and follow the [t]rial [c]ourt's instructions and decide the case on the facts presented and the [t]rial [c]ourt reached two different conclusions." *Id.* (record reference omitted).

"The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." ***Commonwealth v. Smith***, 206 A.3d 551, 562–563 (Pa. Super. 2019) (quotation omitted). "A finding regarding a juror's impartiality 'is based upon determinations of demeanor and credibility that are peculiarly within a trial [court]'s province . . . [Its] predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.'" *Id.* at 562 (quoting ***Commonwealth v. Smith***, 540 A.2d 246, 256 (Pa. Super. 1988)).

Contrary to Appellant's position that there is no record evidence indicating that Juror Number 2's ability to deliberate fairly was compromised, Juror Number 2's own statement that he now believed the trial testimony was false based on what he observed outside of the courthouse provides ample support for the trial court's decision to discharge him. Although Juror Number 2 subsequently indicated he could put the incident out of his mind, the trial court, as the sole determiner of credibility, concluded that Juror 2 was unable to be fair and impartial. There is no basis to disturb the trial court's credibility

determination.  ***See Cosby***, 224 A.3d at 426–427 (appellate courts bound by the trial court's credibility determination of juror's testimony).

Additionally, we reject Appellant's claim that the trial court's decision not to grant a mistrial was inconsistent with its decision to dismiss Juror Number 2.  The two results are readily reconcilable.  On the basis of the jurors' testimony during the first *in camera* interview, occurring immediately after the incident, the trial court determined that the jurors were able to continue serving as fair and impartial jurors.  None of the jurors, Juror Number 2 included, indicated that his or her opinion of the case was influenced by the incident.  However, the following day, Juror Number 2 revealed that he had made a conclusion as to the veracity of testimony given based on the incident he witnessed.  The trial court was well within its discretion to discredit Juror Number 2's representation that he could disregard the incident.  Therefore, the trial court properly exercised its discretion in removing Juror Number 2 and replacing him with an alternate; accordingly, this issue lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/26/2021

- 22 -